[Nos. A101719, A104661. First Dist., Div. Four. Mar. 29, 2006.]

In re the Marriage of ANNA and MACIEJ JAN KIETURAKIS.
ANNA KIETURAKIS, Appellant, v.
MACIEJ JAN KIETURAKIS, Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

60

**COUNSEL**

Law Offices of Vivian L. Kral and Vivian L. Kral for Appellant Anna Kieturakis.

Law Offices of Bernard N. Wolf and Bernard N. Wolf for Appellant Maciej Jan Kieturakis.

**OPINION**

**REARDON, Acting P. J.**—Anna Kieturakis appeals from the order denying her motion to set aside the parties' marital settlement agreement and the judgment incorporating that agreement. Maciej Jan Kieturakis appeals from the subsequent order granting Anna's request for increased support, and Anna

appeals from the support order insofar as it denied her attorney fees. The court reserved jurisdiction to modify its decision on the support issues in the event we conclude that the marital settlement agreement and judgment should have been set aside. Maciej acknowledges that the fee issue may need to be revisited if the support ruling is overturned. The appeals have been consolidated for briefing and decision.

The most significant issues, addressed in the published portion of the opinion, are presented in the appeal from the order declining to set aside the settlement and judgment. The marital settlement agreement was reached in a mediation, and Anna sought to undo the property division on grounds of fraud, duress, and lack of disclosure. Anna refused to waive the mediation privilege to allow disclosure of what transpired in the mediation, and thereby sought to prevent Maciej from defending himself against her allegations— charges on which the trial court found, based on the presumption of undue influence attaching to unequal marital transactions, Maciej bore the burden of proof. The trial court avoided that unacceptable result by admitting evidence from the mediation over Anna's objection, including evidence from the mediator over the mediator's objection. The mediation evidence, in large measure, defeated Anna's case. She contends on appeal that the evidence was wrongly admitted.

We hold, for a number of reasons, that Maciej should not have been made to bear the burden of proof on Anna's motion. In this regard, the presumption of undue influence in marital transactions must yield to the policies favoring mediation and finality of judgments. In view of this conclusion and in the particular circumstances of this case, any error in admitting evidence from the mediation was harmless.

In the unpublished portion of the opinion, we reject the parties' arguments against the support and fee rulings. Accordingly, we affirm the orders.

## I. MARITAL SETTLEMENT AGREEMENT
### (No. A101719)

A. *Statutory Background*

(1) *The Mediation Privilege*

■ Admission of evidence of what has transpired in a mediation is restricted by Evidence Code section 1115 et seq.[1] Section 1119, subdivision (c) provides that all communications, negotiations, or settlement discussions among participants in the course of a mediation or a mediation

---

[1] Unless otherwise indicated, all further statutory references are to the Evidence Code.

consultation are to remain confidential. A "mediation consultation" means "a communication between a person and a mediator for the purpose of initiating, considering, or reconvening a mediation or retaining the mediator." (§ 1115, subd. (c).) Section 1119, subdivisions (a) and (b) direct that, except as otherwise permitted in these statutes, no "evidence of anything said or any admission made," or "writing . . . that is prepared," for "the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery," and disclosure of such evidence or writings "shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given."

These prohibitions do not apply if all those conducting or participating in the mediation expressly agree to waive them (§ 1122, subd. (a)(1)), and limited exceptions to the prohibitions are afforded for, among other things, signed settlement agreements reached in mediation that are binding by their terms (§ 1123). In addition, to "prevent[] parties from using a mediation as a pretext to shield materials from disclosure" (27 Cal. Law Revision Com. Rep. (1997) p. 601), section 1120, subdivision (a) provides that "[e]vidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation or a mediation consultation."

Unless all parties to the mediation expressly agree otherwise, no "report, assessment, evaluation, recommendation, or finding of any kind by the mediator" concerning the mediation can be submitted to, or considered by, a court (§ 1121), and section 703.5 provides, with certain exceptions, that mediators are not "competent to testify, in any subsequent civil proceeding, as to any statement, conduct, decision, or ruling, occurring at or in conjunction with" the mediation.

Section 1128 makes any reference to a mediation in any later civil proceeding "grounds for vacating or modifying the decision in that proceeding, in whole or in part, and granting a new or further hearing on all or part of the issues, if the reference materially affected the substantial rights of the party requesting relief."[2]

---

[2] We will for convenience generally refer to the confidentiality provisions of these statutes as "the mediation privilege," even though the statutes confer independent privileges on the parties and the mediator (*Olam v. Congress Mortg. Co.* (N.D.Cal. 1999) 68 F.Supp.2d 1110, 1130 (*Olam*)), and the statutes could be characterized as providing for confidentiality rather than a privilege (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1572, fn. 5 [36 Cal.Rptr.3d 901]).

### (2) *Grounds for Setting Aside the Judgment*

■ Family Code section 2122, as it formerly read, provided the following grounds for setting aside a judgment: "(a) Actual fraud where the defrauded party was kept in ignorance or in some other manner, other than his or her own lack of care or attention, was fraudulently prevented from fully participating in the proceeding. An action or motion based on fraud shall be brought within one year after the date on which the complaining party either did discover, or should have discovered, the fraud. [¶] (b) Perjury. An action or motion based on perjury in the preliminary or final declaration of disclosure or in the current income and expense statement shall be brought within one year after the date on which the complaining party either did discover, or should have discovered, the perjury. [¶] (c) Duress. An action or motion based upon duress shall be brought within two years after the date of entry of judgment. [¶] (d) Mental incapacity. An action or motion based on mental incapacity shall be brought within two years after the date of entry of judgment. [¶] (e) As to stipulated or uncontested judgments or that part of a judgment stipulated to by the parties, mistake, either mutual or unilateral, whether mistake of law or mistake of fact. An action or motion based on mistake shall be brought within one year after the date of entry of judgment."[3]

## B. *Evidence*

The parties began their relationship in high school in Poland, were married in 1984, and had one child, Maximilian, born in 1991. Maciej is a surgeon and an inventor of surgical devices. While residing in Poland, Anna obtained the equivalent of a master's degree in English, was active in the Solidarity movement, and served as an administrative assistant to Lech Walesa. In the United States, Anna had been a waitress, travel agent, Polish language lecturer at Stanford, and partner in a business that translated books into Polish and published them in Poland.

Anna petitioned to dissolve the marriage in October 1998. The parties filed income and expense declarations on July 15, 1999, showing monthly income of $14,325 and expenses of $18,410 for Maciej, and monthly income of zero and expenses of $10,912 for Anna. A judgment of dissolution was filed on July 23, 1999, which incorporated a marital settlement agreement (MSA) executed by the parties on June 23, 1999, that was reached through mediation with mediator Anne Lober.

---

[3] For judgments that became final on or after January 1, 2002, Family Code section 2122, subdivisions (a) and (b) have been amended, and a new subdivision (f) has been added covering failure to comply with financial disclosure requirements. (Stats. 2001, ch. 703, §§ 7, 8.)

The MSA provided that Maciej would pay Anna $8,500 per month in family support, and that spousal support would terminate on June 1, 2007. The amount of support was made modifiable "upon good cause appearing," "upon a change of circumstances, and as provided by law." In the property division under the MSA, Maciej received among other things all interest in "the intellectual property described as [the] 'balloon dissector, a surgical device.' " The parties acknowledged in the MSA that the law "impose[s] a fiduciary duty on married persons regarding the accurate and complete disclosure of all assets, liabilities, and investment opportunities that were acquired, contracted or arose or may have arisen during the course of the marriage." The parties each affirmed service to the other of a declaration of disclosure and an income and expense declaration. The parties averred that they were "fully aware of the contents, legal effect and consequences of [the MSA] and its provisions," and that the agreement had been "entered into voluntarily, free from duress, fraud, undue influence, coercion or misrepresentation of any kind."

Nearly two years later, on June 26, 2001, Anna filed an order to show cause to set aside the judgment and MSA, and to modify the support she was receiving. She filed an income and expense declaration on that date listing no income and monthly expenses of $9,326.

Anna's supporting declaration stated that she had "acted under tremendous pressure" from Maciej and been intimidated by him into signing the MSA. She said that Maciej had "reacted with uncontrolled anger and threats" when he learned that she had retained an attorney, Harry Hanson, to represent her in the divorce. When she met with Hanson she could not answer most of his questions about the family's assets, and she had "only a vague idea . . . that [Maciej] derived income from royalties from his inventions." "After several days of threats and constant screams" from Maciej, she finally agreed to his demand to mediate a settlement without any legal representation, "knowing full well that I could not adequately represent my and my child's interests, as Maciej had always been able to bully me into submission during our marriage." Anna said that she did "not remember much of the mediation because I was crying so hard all of the time," but that all of the mediation sessions "looked the same: Maciej was talking, presenting his plans and I was crying, feeling intimidated, wanting it all to finally come to an end." They talked to "a Mr. Tollemache, who was supposed to appraise Maciej's companies, as well as his royalty agreements. Maciej spent hours convincing him that he was practically on the verge of bankruptcy and that his business and his companies were worth nothing. [¶] . . . [¶] . . . At the time we reached our agreement, I was force [sic] to give Maciej his businesses, his surgical practice and the rights to all of his royalties on the grounds that any income from them was 'speculative.' "

Anna also filed a declaration from attorney Hanson outlining his contacts with the parties. Hanson said that when Anna first met with him in June 1997 to discuss dissolving the marriage, she told him that she "had suffered from her husband's verbal abuse, among other things." Anna was prepared to go forward with the dissolution when he next met with her in September 1998, and he noted at that time that she "was clearly intimidated by her husband." After he filed Anna's petition for dissolution, she asked if he would mediate her case with Maciej. Hanson indicated that he would need a conflict waiver from Maciej, and he met with Maciej on October 22, 1998, to discuss possible mediation of the case. In January 1999, Anna advised that she and Maciej would be mediating the case with someone else.

In his responsive points and authorities, Maciej argued that Anna's declaration was inadmissible insofar as it referred to communications during the mediation. Maciej submitted that "[t]he initial determination which this court will need to make is to rule upon whether, after the application of Evid. C[ode] § 1115 et seq. (making inadmissible evidence of communications during the mediation proceedings), [Anna] will be able to make a requisite showing of duress sufficient to set aside the [MSA]." He "want[ed] it to be very clear that he ha[d] no intention whatsoever to waive to any extent the confidentiality protection for any communications or documents that were part of the mediation process."

Maciej filed an income and expense declaration on October 2, 2001, showing monthly income of $37,547, monthly expenses of $18,340, and royalty income of $540,810 during the preceding 12 months. Anna filed points and authorities that cited Maciej's alleged failure to furnish declarations of disclosure as an additional ground for setting aside the MSA, and included "as an offer of proof" that she had no idea he had any ongoing royalty income before seeing his October 2001 income and expense declaration.

At a hearing on November 19, 2001, counsel for Maciej advised that, contrary to Maciej's previously stated position, he would stipulate to a waiver of the mediation privilege with respect to all communications during the mediation process other than those in his October 1998 meeting with Hanson. Anna's counsel said that she "would be happy to enter into a stipulation to completely waive the mediation privilege," but was not prepared to stipulate to the partial waiver Maciej proposed. Anna was given a week to accept the stipulation and did not do so.

The court filed orders concerning mediation confidentiality in February 2002. The court determined that the October 1998 meeting between Maciej and Hanson was a "mediation consultation" within the meaning of section 1115, subdivision (c), and thus that communications in the meeting, and

writings prepared for the meeting, were inadmissible and not subject to discovery. The court found that the mediation between the parties and mediator Anne Lober started no later than their first session on January 27, 1999, and ended on June 23, 1999, when the parties executed the MSA. Under section 1119, all communications during the mediation sessions with Lober, and communications between the parties outside the sessions on the issues and subjects discussed in the sessions, were inadmissible and not subject to discovery. Discovery could be conducted into whether Judicial Council form disclosure documents were ever exchanged by the parties, but any disclosure documents prepared for the mediation and not filed with the court, as well as communications concerning those documents, were inadmissible under section 1119 and not subject to discovery.

In March 2002, Anna filed an amended order to show cause citing, as grounds to set aside the judgment and MSA, duress, actual fraud, constructive fraud, and failure to exchange declarations of disclosure.

In May 2002, Anna moved for a protective order to prevent Maciej's counsel from questioning her in deposition about documents she allegedly received in the course of the mediation. At the hearing on the motion, the court noted that the parties' original positions on waiving the mediation privilege had completely changed: Anna was originally willing to waive the privilege with respect to all evidence pertaining to the mediation, but was now unwilling to waive it with respect to any such evidence; Maciej was initially unwilling to waive the privilege at all, but was now willing to waive it entirely. The court denied a protective order, continued its prior discovery orders in effect, and instructed with respect to Anna's deposition that documents claimed to be privileged were to be marked "confidential," and placed in a sealed envelope for possible later examination by the court to determine whether they should be received in evidence for purposes of impeachment. The court advised at the hearing that it would not look at those documents "unless a proper foundation is ultimately shown to me that either party is using the mediation as a shield to lie," and wrote in its ruling that it "reserve[d] the right to continually look at the mediation privilege issue in light of evidence that comes in, and to modify its previous orders if appropriate."

Anna petitioned this court for a writ of mandate to overturn the decision on her motion for the protective order. We denied the motion and wrote: "The trial court has made no final decision about disclosure of the information [Anna] seeks to protect. Also, we have substantial doubt that [Anna] may bar [Maciej] from developing evidence about what took place during the mediation. Our doubt arises because [Anna] has challenged mediation-related conduct and specific elements of a marital settlement agreement reached in

mediation and [Anna] herself disputes a statement made in the agreement. Only by limiting her challenge to the fact of mediation and focusing her showing upon the circumstances leading up to mediation without legal representation, not upon conduct of mediation and details of the agreement arising from the mediation, could [Anna] protect information about the conduct of the mediation."

The court subsequently requested briefing from the parties on the admissibility of documents sealed at Anna's deposition, and on whether mediator Lober and J. Nicholas Tollemache, who was hired to appraise assets during the mediation, could be called to testify and produce documents. Anna argued that Lober's e-mails and Tollemache's reports to the parties were privileged and inadmissible, and objected to an in camera review by the court of those or other sealed documents. She also objected, based on the mediation privilege, to Lober and Tollemache testifying.

At the July 2002 hearing on these issues, the court determined that Lober and Tollemache could be called to testify under seal to enable the court to determine whether their testimony was relevant and admissible. The court overruled Anna's objection to its review of the sealed documents, said that it had examined the documents, and indicated that the documents contained information that Anna claimed she did not know when she entered into the MSA. The critical question thus created, in the court's view, was whether Anna received the documents before she executed the MSA. Under the circumstances, the court believed it would likely be called upon to weigh the interests of fairness and justice in the case against the policies behind the mediation privilege in order to decide whether to admit the mediation evidence. The court reasoned, with reference to our order on the writ petition, that Anna's challenge to the MSA was not limited to the circumstances that led up to the mediation. Anna's allegations that the MSA was procured under duress, that requisite financial disclosures were not made, and that Maciej's income and expense declaration was false, contradicted acknowledgements in the MSA and thereby, in the court's view, put at issue the conduct of the mediation that produced that agreement.

Mediator Lober objected, based on sections 1119, 1121 and 703.5, to the subpoena requesting her appearance for testimony and production of documents in the case. She submitted a declaration stating that the parties were precluded, under the terms of their mediation agreement, from calling her as a witness or requesting her to produce documents in any subsequent proceeding. She indicated that the seven attorneys in her office had provided mediation services and consultations to over 50,000 people in the preceding 12 years, and that none of them had ever been required to testify in court concerning those matters.

Lober wrote in her points and authorities: "Confidentiality and neutrality are the life and breath of mediation. A party must be guaranteed that statements made by him or her will not be admissible in a later action, for without this guaranty the party will never speak frankly and honestly. Similarly, a party must be guaranteed that the mediator is neutral, for without this guaranty the party will not continue in the voluntary mediation process. [¶] . . . [¶] To require testimony of a mediator is to require that the mediator take sides in a dispute, because the subpoena is served only when one party wants the mediator to testify on his or her behalf. If a mediator takes sides, it is a breach of trust and makes a lie of the promises that are made by mediation. I have personally promised every client that I will never turn against them by testifying in court. I ask that this court not require me to do so now."

Before the start of trial the parties stipulated that attorney Hanson could testify "without regard to any attorney-client privilege and without regard to any mediation privilege." They also agreed that the "Declaration of Disclosure" listing their assets, prepared by mediator Lober and signed by the parties during the mediation, would be admissible. Anna filed a trial brief arguing among other things that the MSA was more favorable to Maciej than to her, and thus that he bore the burden of proving that the agreement was not obtained through fraud or undue influence. Maciej's trial brief argued among other things that Anna had waived the mediation privilege given the nature of the claims she was asserting.

At the outset of trial the court overruled Anna's and Lober's objections to Lober testifying, the court closed the courtroom, and Maciej called Lober to testify under seal as the first witness in the case. Lober said that she considered it one's duty as a mediator to attempt to determine whether the parties were "acting under their own free will," and that "no indication of any coercion or duress . . . ever occurred in [her] presence" during the mediation. She told the parties that they had the right to be represented by their own attorneys, and she had "[n]o information regarding anything forced in any way" upon one party by the other in this case. Lober said she "wouldn't know" whether Anna fully understood the terms of the parties' agreement, but she did not recall Anna expressing confusion in the mediation.

Lober sent the parties e-mails on January 28, March 18, March 25, and April 16, 1999, summarizing matters covered in the mediation sessions. The first three of these e-mails included boilerplate language stating that "[t]he contents of this memorandum shall not be placed in evidence in any court-related proceeding"; all of the e-mails were, however, admitted into evidence at trial.

The January e-mail noted with respect to Maciej's surgical invention that he "believes that the highest amount of royalties have already been paid, but expects that a less, though still substantial amount will continue to be paid under the royalty agreement." Lober said that this was written to memorialize statements Maciej made in the mediation. Lober said that this e-mail "did not bounce back" to her, but that she did not otherwise know whether Anna received it. The March 18 e-mail stated in part: "$200,000 came in from royalties last year. . . . Anna has not participated enough in the finances of the family, and now must put energy into her financial education so she can participate fully in the mediation—and plan her future." The January e-mail stated that Lober had suggested to the parties that they retain appraiser Tollemache to value the royalty agreement and other assets. The March 25 e-mail reported that "[w]e reviewed the property division in greater depth, and began a review of the valuations done by Nick Tollemache . . . . Valuation of the patent was considered as speculative by the expert."

The April 16 e-mail covered the paperwork required to finalize the agreement reached the day before in the last of the mediation sessions. The April e-mail indicated that it had been agreed that the family support to be paid by Maciej would be tax deductible to him and "all includible in taxable income to Anna." Lober wrote among other things: "Please review carefully and think about our settlement as contained in the Questionnaire we filled out. If you still agree to the terms of it, please both of you just fill in the few remaining blanks and return to me. . . . If either of you have changed your mind on the settlement, do not despair; I am available to help. Just set an appointment with me."

The terms of the agreement were set forth in a "Marital Settlement Agreement Worksheet" Lober filled out in consultation with the parties. The MSA worksheet included the "Declaration of Disclosure" the parties agreed to have placed in evidence at trial, which listed the community assets, their value, and how they were to be divided. Lober said that her office had used this form in thousands of mediations, that it was easier to use than the standard Judicial Council forms, and that it covered all of the disclosures required by statute. Lober wrote on the form that the value of royalties on the surgical device was "unk" (unknown); Lober did not recall discussing the royalties during the mediation, but said that Anna would have been present when she wrote on the form that their value was unknown. Lober could not recall details as to the property valuations, and did not, for example, remember if Maciej ever gave her any royalty statements. She said she had not appeared in court for 15 years, and "[i]f I had known I was going to have to testify, I think I would have been much more—would have taken a lot of notes and kept a lot of paper."

The parties signed the MSA worksheet on April 29, 1999, and returned it to Lober's office for preparation of an MSA pursuant to its terms. Lober asked the parties to fill out handwritten income and expense declarations on the Judicial Council form. According to the MSA, the parties served each other with these declarations, and the preliminary and final declarations of disclosure included in the worksheet, on May 6, 1999. This was accomplished by personnel in Lober's office who signed a proof of service. Her office eventually typed up the income and expense declarations, and sent them to the parties along with the MSA for signature; these documents were executed by the parties on June 23, 1999.

After Lober's testimony concluded, the court ruled that if Anna showed that the MSA was more favorable to Maciej than to her, then Maciej would have the burden of proving that he did not exercise undue influence to obtain that advantage.

Attorney Hanson testified for Anna that when she first consulted him in June 1997, she reported that Maciej was verbally abusive toward her, and she seemed to be fearful of him. Hanson next met with Anna in September 1998; his notes of that meeting listed "royalty income" as one of the matters to investigate, and stated: "Husband very threatening and blackmailing. . . . Husband verbally abusive. Husband has not threatened. He screams very loudly." Hanson testified that Anna seemed very anxious and distraught, he wrote in his notes that she was "clearly intimidated" by Maciej, and he advised her not to negotiate directly with Maciej. Anna met with Hanson on October 13, 1998, paid him a $7,500 retainer, and signed the petition to dissolve the marriage filed on that date. Anna called the office later that day and said that she wanted to mediate, rather than litigate, the divorce, and to retain Hanson as the mediator.

Maciej met with Hanson on October 22, 1998, to discuss having Hanson act as the parties' mediator, and outline his positions on issues in the divorce. In his memorandum about the meeting Hanson wrote in part: "He told me his view is he doesn't want to cause any harm to his wife and he wants her to have enough money to pay her bills, that she can have 50% of the assets and even more than half of the retirement plan if that seems appropriate. He doesn't want to divide all the assets equally and then support her forever. . . . [¶] His view is that his medical practice is his because he worked for it and his inventions are his because he invented them and she had nothing to do with that. He recognizes this is different from California law, but he wanted me to know how he feels about that. I told him I would require that they each have consulting counsel as a condition to mediation and he didn't like that much because he feels that Anna is very suggestible and she will follow the advice of her consulting counsel who will probably advise her against a deal that he would find acceptable."

On November 10, 1998, Anna wrote Hanson an e-mail stating that she and Maciej had agreed on how their assets would be divided and on how much support Maciej would pay, and asked Hanson if he would help them draw up the necessary documents. Hanson replied the next day: "If I am to be the mediator there must be consulting counsel or the agreement is no good. We can not help you unless you follow this requirement. You make a mistake to do it yourself. There is too much involved." Anna advised Hanson by e-mail on January 18, 1999: "I have found an independent mediator to help us along with the process. I may still use your services as my own attorney, if such a need arises, so for the time being please keep the retainer money, but do not act in any way without communication with me." Hanson said that Anna did not consult him during the mediation, and that she called him on May 4, 1999, to request a refund of the remainder of her retainer.

Anna testified that she paid Hanson's retainer with a credit card, and was so afraid that Maciej would be upset with the charge that she called him from the parking lot of Hanson's office after their October 13 meeting. She said that Maciej "freaked out" when he heard that she had retained a lawyer, and said "[i]f I do that, he will have to hire three lawyers of his own and . . . they would eat up all our money and we will be left with nothing, but, of course, to him it doesn't matter because he has earning potential, but I don't so I and Max . . . would end up on the street." Anna's close friends Kasia Kietlinska and Evwa Dyk recalled Anna telling them of these threats. Anna said that Maciej made all the decisions in their marriage, that he constantly demeaned her, that he always yelled at her, and that in the year leading up to the divorce he was verbally abusive to her. Kietlinska testified that Anna never stood up to Maciej, that he humiliated her in public, and that he ordered her around to show who was the boss. Dyk testified that Maciej was insensitive to Anna and that she was afraid of him. Kietlinska and Dyk said they tried to convince Anna to retain counsel to represent her in the divorce. However, Anna testified that Maciej convinced her that they could not afford separate lawyers, and that they should mediate the case.

Anna said that she thought she had fired Hanson when she told him not to do anything without her authorization, and that she did not believe she could consult with him during the mediation. Anna said that she thought mediation was supposed to lead to a fair agreement, and that Lober would be looking out for her interests during the process. Anna acknowledged that her e-mail address appeared on Lober's January 28 e-mail recounting Maciej's statement that he expected to receive substantial future royalty payments. But she did not remember receiving that e-mail, or Maciej making that statement, and said she would not have given away her share of the royalties if that statement had been made. She said no one ever told her that the royalties could be divided in half.

Anna testified in deposition that she did not know whether any royalty payments were made in 1998, but at trial admitted that she was aware, during the mediation, that royalties were received that year. She said that Maciej told her, before she went to see Hanson in 1998, that he would be receiving no more royalties, and that she so informed Hanson. Dyk and Kietlinska recalled Anna saying that no further royalties would be paid. Anna said she did not learn that Maciej continued to receive royalty payments until she received his 2001 income and expense declaration. In his 1999 income and expense declaration, Maciej did not list any royalty income for the preceding 12 months.

Appraiser Tollemache's report on the royalties showed income of $140,025 in 1998, including $22,378 in the fourth quarter as reported by Maciej. Anna testified that Maciej never told her about that royalty payment, and she denied receiving Tollemache's appraisal before signing the MSA. Anna said that she learned of Tollemache's conclusion that it was impossible to value the future royalties, which she took that to mean that the royalties had "zero value." She said she was led to believe by Maciej and Lober that "[n]o specific figure can be put on them. To me I understood it as that they cannot be valued, they cannot be evaluated; therefore, I get nothing." She recalled meeting with Maciej and Tollemache, but said that her notes of the meeting were incoherent. She said she cried during the meeting because Maciej humiliated her by saying that she would get more property from him only over his dead body. Anna's initial moving papers to set aside the MSA stated that Maciej was receiving "the admitted sum of over $140,000 a year" in royalties when the MSA was executed. When Anna was asked at trial where she had gotten that number, she initially said that she did not know. She later said the number was furnished by Lober in the mediation, and she did not know where Lober got the figure.

Anna testified in her deposition that she read and understood the MSA before she signed it, but testified at one point at trial that she "didn't quite read it," and "had just a minute to sign it." She said that she often broke down and cried during the mediation sessions, and that she agreed in the sessions to everything Maciej wanted. She knew when she entered into the MSA that she could not make ends meet with the level of support she would be getting, but she had hoped to earn enough money to make up the shortfall. By November 1999, when she was having to take money from her savings to pay the bills, she realized that she had been "badly taken advantage of" in the MSA. She agreed to a termination of support because she understood from Maciej that this was what the law required; no one ever told her that support could have continued indefinitely given the length of the marriage. She first testified that she "wasn't quite aware of the implications" of the termination of support, and "didn't know if it was subject to further negotiation," but later

acknowledged that Lober told her, and she understood when she signed the MSA, that support would terminate on June 1, 2007.

Psychologist Paul Berg testified for Anna that he gave her tests to gauge her mental status, personality, and aptitude for negotiation. The results showed that Anna was "insecure; that she was easily influenced by others; that she tends to yield in situations rather than to confront or stand up for herself; that she tends to be disorganized especially under stressful situations; further, that she is very submissive to authority; that she is dependent; that she defers decisions." She suffered from "a very high degree of stress," low confidence, and low self-esteem. "[T]his is not a woman," Berg opined, who "could hold her own when she is confronted by any kind of source that she perceives as being more powerful than herself."

Psychiatrist James Missett testified for Anna that she had a psychological profile consistent with her claims in the case. She suffered from a long-standing depression and had a "dependent personality disorder of the passive type." She had low self-esteem, exhibited symptoms of psychological abuse, and would have been unable to negotiate with Maciej. Missett acknowledged that Anna was intelligent, and that people with her psychological profile could function well in society. He admitted that Anna was capable of doing things that upset Maciej while the MSA was being negotiated, and that she might have known what she was doing during the mediation.

Psychologist Patricia Sullivan testified for Maciej that she had read the reports of Anna's experts and watched Anna's videotaped deposition. In Sullivan's opinion, Anna exhibited no signs of battered wife syndrome or spousal abuse; for example, she had the independence to leave Maciej for months every year to take Max to Poland. Sullivan said there was evidence of "faking" in Anna's responses to the psychological tests, and the test results were selectively interpreted by Dr. Berg. Given Anna's education, "rather extraordinary verbal skills," and work experience, Sullivan did not think she would be helpless in negotiations.

Tollemache testified under seal as Maciej's witness regarding his appraisals of the parties' assets, including the royalty payments. The royalty appraisal showed payments of $335,988 in 1997 and $140,025 in 1998, noted that the guaranteed payments in 1997 were not repeated in 1998, and indicated that the amount of future royalties, "if any," was "unknown." The appraisal provided the present values of various annual payment streams over different periods of years, ranging from a low of $70,000 in royalties for one year ($63,903) up to a high of $210,000 in royalties for 17 years ($1,098,363). His purpose "was to produce a range of possible values based upon different assumptions that would be used in the mediation process." He said that

Maciej "really didn't have any idea what would happen in the future" with the royalties, and that Maciej "absolutely" did not tell him that there would be no further payments.

Tollemache's appraisal reports were addressed to the parties at Maciej's business address. Tollemache testified that he had separate fax numbers for the parties, and said that he would ordinarily have faxed copies of his appraisals to both numbers before sending out a hard copy, but he kept no record of the transmissions. He said that he telephoned Anna when the reports went out; it was his practice to provide clients with a brief summary of his reports before they received them. He said that Anna later called him about the reports, and "clearly asked me questions which she would only have asked me had she received them." Tollemache did not recall Maciej saying in their meeting with Anna that she would get assets from his businesses over his dead body.

Anna called Maciej as a witness and introduced into evidence tax returns and correspondence reflecting the amount and timing of the royalty payments he received. Schedule E to the parties' 1998 federal income tax return showed royalty income of $199,855 that year. The return was sent to the parties at Maciej's address in June 1999, and he testified that he and Anna would have signed the return by September of that year. Schedule E to Maciej's 1999, 2000, and 2001 returns showed royalty income of $127,733, $403,611, and $580,213, respectively. Royalty checks for the last calendar quarter of 1998 and the first calendar quarter of 1999, in the respective amounts of $22,338 and $26,727, were sent with cover letters on the respective dates of January 14 and April 13, 1999. Maciej did not recall giving Anna copies of these royalty statements. Maciej said that he knew Anna received copies of Tollemache's appraisals because those documents were used in a mediation session with Lober. He denied that he did not want Anna to have an attorney because he feared she would follow the attorney's advice.

Maciej testified on direct examination that Lober advised the parties that they were free to consult with attorneys of their choice, and he said that Anna actively participated in the mediation. He denied screaming at Anna and demeaning her in public. He said that they argued frequently throughout their relationship, and that she "would usually do what she wanted" when they disagreed. He described Anna as "very persistent in obtaining what she wanted" from people in stores and restaurants, "sometimes to the level of embarrassment." Jolanta Tomaszewski testified that she had known Anna for 10 years, and that she and her husband socialized with Anna and Maciej. She said that she never saw Maciej ridicule or embarrass Anna, and that Anna

never exhibited any fear of Maciej. Maciej's best friend, Alexander Karczewski, testified that he had seen Maciej be cold, but not cruel, to Anna. He had seen them fight in raised voices, but without shouting or ridicule.

## C. *Trial Court's Decision*

The able trial court devoted a substantial portion of its polished 30-page statement of decision to application of the mediation privilege, a legal issue it described at trial as the most difficult it had ever faced. The court concluded, for a number of reasons, to admit the mediation evidence, including all of the documents generated during the mediation, and the testimony of Lober and Tollemache. First, the mediation witnesses had "considerable personal knowledge of matters central to Anna's claims," and thereby "add[ed] unbiased, independent and eye-witness evidence to an otherwise 'he and his friends say' versus 'she and her friends say' situation." Second, the court was "greatly troubled" by the parties shifting positions with respect to the privilege. Third, a contrary ruling would be unfair to Maciej: "The Court simply cannot entertain one party's claim that she acted under duress or undue influence at the time she entered into an agreement without allowing the other party to present evidence of the facts and circumstances surrounding the execution of the agreement in an attempt to refute that claim." Fourth, Lober's testimony helped to explain the MSA insofar as it established that the mediation "was conducted in a facilitative, rather than evaluative, manner." Fifth, while the court had "painfully struggled with the threat [its ruling] posed to the values underlying the mediation privilege," it did not believe that the ruling would threaten the confidentiality of future mediations. It was the court's "belief and experience that this case is the rare exception to the general rule that parties who settle their disputes through mediation are generally more satisfied with the result than parties who submit their respective claims to a court for determination." The court reasoned finally that "[t]o uphold the mediation privilege here would merely thwart this Court's ability and obligation to do justice in this particular case and undermine confidence in our judicial system."

Turning to the merits, the court first determined that the MSA was more favorable to Maciej than Anna in a number of respects: He was awarded all of the community's interest in the royalty payments; the royalties were not included in his income for purposes of calculating the family support he paid; Anna received no consideration for agreeing to an absolute termination date for spousal support; and Maciej received credit for assuming postseparation debts of $160,000 that were erroneously characterized as community obligations. The court concluded that these advantages Maciej obtained in the transaction created a presumption of undue influence that he had the burden of rebutting. The court reasoned that Maciej therefore bore the burden of

proving that the MSA was not the result of duress, fraud, or perjury, and the court found that Maciej met his burden of proof on all of Anna's claims.

The allegations of duress were that Maciej prevented Anna from obtaining advice of legal counsel, and forced her into agreeing to the MSA. The first allegation was unpersuasive to the court because Anna did not fire Hanson and ask for return of her retainer when Maciej allegedly threatened her after learning she had hired Hanson. Instead, when the matter proceeded to mediation, she advised Hanson that she might still need his services, and she did not ask for the balance of the retainer until after she had signed the MSA worksheet setting forth her agreement with Maciej. Under the circumstances, the court found that Anna freely chose not to avail herself of Hanson's services.

As for whether Anna entered into the MSA "against her free will," the court reviewed the expert testimony about her personality traits, the testimony of the parties and their friends, and the testimony of Lober and Tollemache, who observed no coercion or threats by Maciej. The court also "carefully considered its own impressions of Anna from watching her testify in court on and off over several days. Anna impresses this Court as being a highly intelligent woman with many talents and abilities of her own and who has evidenced a very strong will in her past endeavors and personal decisions. In short, the Court has much difficulty accepting Anna's depiction of herself as weak and easily susceptible to undue influence or duress exercised by Maciej." The court thought that "[t]he passage of time and deliberateness of the mediation process"—multiple mediation sessions over a period of months, reminders by Lober that tentative agreements were subject to change, the two-week interval between preparation and execution of the MSA worksheet, two additional months before the MSA was executed—"belie[d] any finding of duress." Such a finding would also have been inconsistent, in the court's view, with Lober's testimony that Anna never professed any confusion, and Anna's testimony that when she executed the MSA she understood, among other things, that she was receiving less than half of the community estate, and that her spousal support would terminate in June 2007. The court thus concluded that Anna entered into the MSA freely and voluntarily.

As for fraud, the evidence "overwhelmingly demonstrate[d]" to the court that Maciej did not mislead Anna about his right to receive continuing royalty payments. Such evidence included Lober's e-mails stating that Maciej said in the mediation sessions that he received approximately $200,000 in royalties in 1998 and expected to receive substantial royalties in the future. The evidence also included Tollemache's testimony that he sent Anna a copy of his report on the royalties, his testimony that she asked questions about the

report that showed she received it, and Lober's e-mail indicating that she and the parties discussed the report in a mediation session.

The court determined that Maciej did not fail to comply with mandatory financial disclosure requirements. The court noted that Lober's testimony explained how the income and expense declarations signed by the parties on June 23, 1999 could have been served on May 6, 1999, and found that Anna was not prejudiced by the failure to make the requisite disclosures on Judicial Council forms. The court acknowledged that Maciej failed to report any royalty income on his income and expense declaration, but found that he disclosed to Anna in the mediation all of the information he had about the royalties. Given that disclosure, the court thought that Anna should have immediately realized that Maciej's income and expense declaration was erroneous, and thus she could not set aside the judgment on the ground of perjury given the statute of limitation. (Fam. Code, § 2122, subd. (b) [perjury claim must be raised within one year after perjury should have been discovered].)

The court concluded finally that Anna's case for setting aside the judgment based on mistake was also time-barred. The court apparently credited Anna's testimony that she did not believe the royalty payments could be divided between the parties, and did not realize she did not have to agree to a nonmodifiable termination of spousal support. The court thought that those mistakes provided Anna's strongest potential grounds for setting aside the judgment, but Anna did not raise them within the one-year statute of limitation. (Fam. Code, § 2122, subd. (e).)

D. *Discussion*

 (1) *Case Law on the Mediation Privilege*

To put the issues before us in perspective, we begin with a review of some of the key cases that have dealt with the mediation privilege.

The mediation privilege was asserted in *Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155 [74 Cal.Rptr.2d 464] (*Rinaker*), in the context of a juvenile delinquency proceeding. Minors accused of vandalizing a car sought to compel the testimony of the person who had mediated a civil harassment action brought against them by the victim. The minors claimed that the victim admitted in the civil action that he did not see who committed the vandalism. The mediator objected to testifying on the ground that statements made during the mediation were privileged under section 1119. The court held that the mediator could be compelled to testify if it appeared that application of the privilege would deprive the minors of their due process right to effective

impeachment of the victim. The juvenile court was directed to hold an in camera hearing with the mediator "to weigh the 'constitutionally based claim of need against the statutory privilege' and determine whether . . . [the mediator's] testimony [was] necessary to 'vindicate [the minors'] rights of confrontation.' " (*Rinaker*, at p. 169.)

In *Olam, supra,* 68 F.Supp.2d 1110, the parties consented to mediation with a court employee under the court-sponsored alternative dispute resolution (ADR) program. They reached a settlement in the mediation, which the defendants moved to enforce. The plaintiff opposed the motion on the ground that she was subject to undue influence when she agreed to the settlement. The parties waived the mediation privilege to permit testimony to be taken about the mediator's and the defendants' interaction with the plaintiff and her attorney during the mediation. The court assumed that the mediator would assert his privilege not to testify about what occurred in the mediation, and addressed whether the mediator could be compelled to testify notwithstanding that objection and section 703.5's declaration that a mediator is not competent to testify about the mediation in a subsequent civil proceeding.

The *Olam* court interpreted the *Rinaker* decision to call for a two-stage balancing analysis: first, to determine whether interests of comparable or greater magnitude to the values underlying the mediation privilege militated in favor of compelling the mediator to appear at an in camera proceeding to reveal what the mediator's testimony would be (*Olam, supra,* 68 F.Supp.2d at pp. 1131–1132); second, to decide, in light of those interests and values as well as the other evidence presented, whether the mediator's testimony "was essential to doing justice" in the case (*id.* at pp. 1131, 1139). This balancing led the *Olam* court to call the mediator to testify under seal, and admit the mediator's testimony to help resolve the motion to enforce the settlement.

*Olam* acknowledged that a number of considerations militated against its decision. There was a risk that people might hesitate to serve as mediators " ' "if, solely as a result of conducting a mediation, they might be required to become witnesses in later litigation involving disputants." ' " (*Olam, supra,* 68 F.Supp.2d at p. 1133, fn. 34.) However, based on the court's considerable experience with ADR programs (see *Foxgate Homeowner's Assn. v. Bramalea California, Inc.* (2001) 26 Cal.4th 1, 16 [108 Cal.Rptr.2d 642, 25 P.3d 1117] (*Foxgate*) [identifying *Olam*'s author, federal magistrate judge Wayne Brazil, as an expert in mediation law]), the court thought that the chances of mediators being called to testify about their past mediations were "extraordinarily small" (*Olam, supra,* 68 F.Supp.2d at p. 1134). Parties might be more reluctant to participating freely and openly in mediation if there were a risk that the process would not be confidential, and mediators were "likely to feel violated by being compelled to give evidence that could be used against a

party with whom they tried to establish a relationship of trust during a mediation." (*Id.* at pp. 1133–1134.) However, those risks were ameliorated where, as in *Olam*, both sides sought the mediator's testimony. In "purely facilitative" mediations, where feelings and interests were sometimes emphasized over historical facts, "it could be both threatening and unfair to hold a participant to the literal meaning of at least some of the words she uttered during the course of a mediation." (*Id.* at p. 1135 & fn. 38.) However, this risk was diminished in *Olam* because the purpose of the mediator's testimony "would not be to nail down and dissect [the plaintiff's] specific words, but to assess at a more general and impressionistic level her condition and capacities," a purpose that "might be achieved with relatively little disclosure of the content of her confidential communications." (*Id.* at p. 1136.)

On the other hand, having the mediator testify advanced a number of important interests. The court recognized "that a mediator might have interests or motives that could affect the accuracy of his or her testimony in a setting like this." (*Olam, supra,* 68 F.Supp.2d at p. 1127, fn. 22.) Mediators would likely measure success by whether a settlement was achieved, and would not want to be found to have "permitted a truly disabled party to sign a contract under duress, or to execute an agreement whose essentials they did not understand, or to be unfairly victimized by an obviously more powerful or sophisticated opponent. So when a party to the mediation claims not to have understood the document she signed, or to have been emotionally and or physically incapacitated when called upon to decide whether to enter an agreement, or to have been overborne by her opponent and the circumstances, it would not be surprising if one of a mediator's reactions was defensive." (*Ibid.*) A mediator is capable, however, of resisting the temptation to defend his or her work (*ibid.*), and there was a "substantial likelihood" in *Olam* (*id.* at p. 1138) that testimony from the mediator—"the only source of presumptively disinterested, neutral evidence" (*ibid.*)—would be "the most reliable and probative on the central issues raised by the plaintiff" (*id.* at p. 1139).

The court thought that having the mediator testify could strengthen the court's mediation program by, among other things, encouraging parties to take mediations seriously and carefully consider proposed agreements. The court was concerned that a contrary ruling could have been "tantamount to denying the motion to enforce the agreement" (*Olam, supra,* 68 F.Supp.2d at p. 1137)—at least where the moving party bore the burden of proof (*id.* at p. 1137, fn. 39)—"because a crucial source of evidence about the plaintiff's condition and capacities would be missing" (*id.* at p. 1137, fn. omitted). The court continued: "Following that course, defendants suggest, would do considerable harm not only to the court's mediation program but also to fundamental fairness. If parties believed that courts routinely would refuse to compel mediators to testify, and that the absence of evidence from mediators would enhance the viability of a contention that apparent consent to a

settlement contract was not legally viable, cynical parties would be encouraged either to try to escape commitments they made during mediations or to use threats of such escapes to try to re-negotiate, after the mediation, more favorable terms . . . ." (*Ibid.*)

The issue in the next case, *Foxgate, supra,* 26 Cal.4th 1, was whether to recognize an exception to the mediation privilege for disclosure of conduct and communications concerning sanctionable behavior during a court-ordered mediation. The plaintiff moved for sanctions on the ground that the defendant had failed to participate in the mediation in good faith. Over the defendant's objection, the court considered declarations of the plaintiff's counsel and the mediator regarding conduct and statements of defense counsel in the mediation. The Court of Appeal recognized that confidentiality was essential to effective mediation and thus worthy of protection, but reasoned that "unless the parties and their lawyers participate in good faith in mediation, there is little to protect." (*Id.* at p. 9.) The Court of Appeal therefore carved out an exception to the mediation privilege for information "reasonably necessary to describe sanctionable conduct and place that conduct in context." (*Ibid.*) This exception permitted "reporting to the court not only that a party or attorney has disobeyed a court order governing the mediation process, but also that the mediator or reporting party believes that a party has done so intentionally with the apparent purpose of derailing the court-ordered mediation and the reasons for that belief." (*Id.* at p. 11.)

The Supreme Court concluded, contrary to the Court of Appeal, that there were "no exceptions" to the confidentiality of mediation communications (§ 1119), or the statutory limits on the content of mediator's reports (§ 1121). (*Foxgate, supra,* 26 Cal.4th at p. 4.) The court noted the strong legislative policy of promoting mediation and other alternatives to judicial dispute resolution, and found that the applicable statutes "unqualifiedly bar[] disclosure of communications made during mediation absent an express statutory exception." (*Id.* at p. 15, fn. omitted.) Sections 1119 and 1121 are "clear and unambiguous" (*Foxgate, supra,* 26 Cal.4th at p. 14), and while those sections allow a party to reveal noncommunicative conduct in a mediation (*id.* at p. 18, fn. 14), they preclude disclosure of mediation communications or a mediator's assessment of a party's conduct (*id.* at p. 17). The sections reflect a legislative decision that parties should be able to frankly express their views during mediation without fear of being sanctioned on the ground that those views evidenced bad faith failure to participate in the mediation. (*Ibid.*) Whether the benefits of mediation confidentiality were outweighed by a policy that might have better encouraged good faith participation in the mediation process was a matter for the Legislature to determine. (*Ibid.*)

*Foxgate* recognized that mediation communications were admitted in *Rinaker* even though no statutory exception to confidentiality applied, but that

result was justified in view of the constitutional rights of juvenile offenders, and the plaintiffs in *Foxgate* had "no comparable supervening due-process-based right" to the use of mediation evidence. (*Foxgate, supra,* 26 Cal.4th at p. 16.) *Olam* was distinguished on the ground that both parties there had waived the mediation privilege. (*Id.* at p. 17.)

The next case, *Eisendrath v. Superior Court* (2003) 109 Cal.App.4th 351 [134 Cal.Rptr.2d 716] (*Eisendrath*), like the case at bench, addressed the mediation privilege in the context of a marital settlement agreement. The husband there moved to correct spousal support provisions reached through mediation based on conversations he allegedly had with the wife during the course of the mediation, but outside of the sessions with the mediator. The wife waived the mediation privilege and moved for a continuance in order to depose the mediator. The husband requested a protective order barring the mediator's deposition and admission of any communications during the mediation sessions. The trial court denied the protective order on the ground that the husband had impliedly waived the mediation privilege, and ordered an in camera hearing to determine whether the mediator should be compelled to testify. These rulings were overturned on the husband's writ petition.

■ The appellate court concluded that the mediation privilege, unlike the privileges provided in section 910 et seq. (e.g., the attorney-client privilege (§ 950), the confidential marital communication privilege (§ 980), the physician-patient privilege (§ 990), and the psychotherapist-patient privilege (§ 1010)), cannot be impliedly waived. Whereas section 1122 provides only for express waivers of the mediation privilege, section 912, subdivision (a) states that the other privileges can be waived "by any statement or *other conduct* of the holder of the privilege indicating consent to the disclosure . . . ." (Italics added.) Some of the other privileges are also expressly subject to the "in issue" doctrine, which creates an implied waiver when the holder of the privilege raises an issue involving the substance of protected communications. (See *Eisendrath, supra,* 109 Cal.App.4th at p. 363.) The court declined to "extend these waiver provisions beyond their existing limits." (*Ibid.,* citing *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d 496] [courts cannot imply unwritten exceptions to statutory privileges].)

The court found it unnecessary to imply a waiver of the mediation privilege to avoid an unacceptable or unfair result. The conversations on which the husband based his motion were made "in the course of" and "for the purpose of" the mediation, and were thus covered by the privilege, even though they occurred outside the mediator's presence. (*Eisendrath, supra,* 109 Cal.App.4th at p. 364, quoting § 1119.) Consequently, evidence of the conversations could not be admitted without express waivers from the husband

and the wife. (*Eisendrath, supra,* 109 Cal.App.4th at p. 365; see § 1122, subd. (a)(2).) The court "recognize[d] that this conclusion gives [the wife] a substantial measure of control over [the husband's] ability to present evidence in support of his motion," but that result was not materially different from the one in *Foxgate,* which "effectively [gave] control over evidence of some sanctionable misconduct to the *party engaged in the misconduct,*" and the wife had in any event indicated her willingness to waive the privilege if the husband also did so. (*Id.* at p. 365.)

Nor could the mediator's testimony be taken absent waivers by the parties and the mediator of their confidentiality rights. (*Eisendrath, supra,* 109 Cal.App.4th at p. 366.) The court noted that a mediator is incompetent to testify to what transpires during a mediation (*ibid.,* citing § 703.5), and refused to apply the *Rinaker* or *Olam* decisions to find an exception to that rule. *Rinaker* was distinguishable because a constitutional right to present evidence was implicated in that case. *Olam* was distinguishable because the mediator was asked to testify there "on a narrow issue peripheral to the agreement achieved through mediation, namely, the competence of a participant," whereas the testimony sought in *Eisendrath* was on the terms of the agreement achieved in the mediation. Even if the parties in *Eisendrath,* like those in *Olam,* both waived the privilege, the court thought that applying *Olam* in the case before it "would authorize mediator testimony in virtually every dispute over a mediated agreement," and thus impermissibly "gut" section 703.5. (*Eisendrath, supra,* 109 Cal.App.4th at p. 366.)

The next case, *Rojas v. Superior Court* (2004) 33 Cal.4th 407 [15 Cal.Rptr.3d 643, 93 P.3d 260], construed section 1119, subdivision (b), which precludes discovery or admission of writings prepared in connection with a mediation. Applying attorney work product principles, the Court of Appeal held that this statute did not protect "nonderivative material" such as raw test data, photographs, and witness statements, and that "derivative material," such as charts, compilations, and expert reports were discoverable, notwithstanding the statute, on a showing of good cause. (*Rojas,* at pp. 411, 414.) The Supreme Court reversed, holding that the statute was to be enforced in accordance with its plain terms. In so concluding, the court reiterated its observations in *Foxgate* on the strong legislative policy favoring mediation and on the need for confidentiality if mediation is to be effective. (*Id.* at pp. 415–416, 422, 424.) As for the alleged "good cause" exception for derivative material, the court found, as it had in *Foxgate,* that no judicially created exception to section 1119 was needed to carry out legislative intent or avoid an absurd result. (*Rojas,* at p. 424.)

The next case, *Doe 1 v. Superior Court* (2005) 132 Cal.App.4th 1160 [34 Cal.Rptr.3d 248], enforced mediation confidentiality to bar public disclosure

of information concerning priests accused of child sexual molestation. The priests participated in a mediation in which the Roman Catholic Archbishop of Los Angeles (Archdiocese) submitted written summaries (proffers) of its files concerning priests who had been identified as molesters. The Archdiocese conceded in some of the proffers that it had notice of an accused priest's propensities toward child molestation before the alleged misconduct took place. The priests moved for a protective order barring the Archdiocese from making the proffers public on the ground that the disclosure would violate section 1122, subdivision (a)(2), which allows a writing made in a mediation to be disclosed if it "was prepared by or on behalf of fewer than all the mediation participants, those participants expressly agree . . . to its disclosure, and the . . . writing does not disclose anything said or done or any admission made in the course of the mediation." A protective order was granted because proffers conceding notice of priests' propensities impermissibly disclosed admissions in the mediation, and proffers not conceding such notice impermissibly disclosed mediation discussions by revealing the Archdiocese's position as to priests whose propensities were allegedly unknown. (*Doe 1 v. Superior Court*, at pp. 1167–1168.)

In so deciding, the *Doe 1* court echoed *Rojas* on the strong legislative policy favoring mediation and the need to safeguard mediation confidentiality. (*Doe 1 v. Superior Court, supra,* 132 Cal.App.4th at p. 1165.) The court recognized that the Archdiocese was trying to release its own admissions, and noted that such a disclosure might not "jeopardize the policy behind mediation confidentiality because disclosure is sought by the party against whom the admission might be used. However, section 1122 does not make such a distinction. Instead, it prohibits the disclosure of *any* admission, without qualification. Given our Supreme Court's insistence on preventing disclosures absent an express statutory exception (*Rojas, supra,* 33 Cal.4th at pp. 415–416), we believe section 1122, subdivision (a)(2) prevents the disclosure of admissions even by the party who made them. We can imagine that in some situations a party's purported 'admission' might be a disguised accusation of another's misconduct. Drawing fine lines in this area seems counter to the policy embodied in *Rojas*." (*Doe 1 v. Superior Court, supra,* 132 Cal.App.4th at p. 1168, fn. 9.)

Most recently, *Stewart v. Preston Pipeline Inc., supra,* 134 Cal.App.4th 1565, considered whether a mediated settlement agreement was admissible under section 1123 in a personal injury action when the agreement was signed on behalf of the defendants only by their attorney. The court held that the lawyer's signature satisfied section 1123's requirement that the agreement be "signed by the settling parties," reasoning that "[t]o hold otherwise would exalt form over substance and would allow mediation confidentiality to nullify otherwise valid settlements agreed upon through mediation. [Citation.] We must not lose sight of the fact that 'California has a strong policy encouraging

settlements' [citation], and that mediation provides a process to assist litigants 'in reaching a mutually acceptable agreement' resolving their dispute. [Citations.] . . . We do not believe that the Legislature intended to permit the tail (mediation confidentiality) to wag the dog (agreed-upon settlement) . . . ." (*Stewart v. Preston Pipeline Inc.*, at p. 1583.)

### (2) *Presumption of Undue Influence*

With that background, we turn to Maciej's argument that he was erroneously required to bear the burden of proof in defending the MSA and the judgment. The court determined that Maciej had the burden of dispelling a presumption that he exercised undue influence in procuring the agreement.

Family Code section 721, subdivision (b) provides in part that "in transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other." In view of this fiduciary relationship, "[w]hen an interspousal transaction advantages one spouse, '[t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence.' " (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293 [39 Cal.Rptr.2d 673].) "Generally, a fiduciary obtains an advantage if his position is improved, he obtains a favorable opportunity, or he otherwise gains, benefits, or profits." (*In re Marriage of Lange* (2002) 102 Cal.App.4th 360, 364 [125 Cal.Rptr.2d 379].) The spouse advantaged by the transaction has the burden of dispelling the presumption of undue influence. (*In re Marriage of Haines, supra,* 33 Cal.App.4th at p. 297.) The presumption can be dispelled by evidence that the disadvantaged spouse entered into the transaction "freely and voluntarily . . . with a full knowledge of all the facts and with a complete understanding of the effect of the [transaction]." (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 630 [35 Cal.Rptr.3d 1].)

Our Supreme Court indicated in *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 27 [99 Cal.Rptr.2d 252, 5 P.3d 815], that the presumption of undue influence applies to marital settlement agreements. At issue in that case was the enforceability of a premarital agreement, and an argument that such agreements are to be enforced under the standards applicable to marital settlement agreements. The court explained that this argument was untenable in part because the presumption of undue influence that arises with respect to unequal agreements between spouses does not attach to premarital agreements, however one-sided. (*Ibid.*) In thus distinguishing between unequal premarital agreements and unequal marital settlement agreements, the court confirmed that the presumption *would* attach to the latter, a conclusion consistent with

applicable statutes. (Fam. Code, §§ 1100, subd. (e), 2102, subds. (a), (b) [fiduciary duties continue until assets are divided and distributed].)

■ Here, there is no dispute that the MSA favored Maciej. We nevertheless hold, for three independently sufficient reasons, that the presumption of undue influence cannot properly be applied to the agreement and judgment in this case.

First, we conclude that the presumption of undue influence cannot be applied to marital settlement agreements reached through mediation. "Voluntary participation and self-determination are fundamental principles of mediation . . . ." (Advisory Com. com., Cal. Rules of Court, rule 1620.3; see also, e.g., *Travelers Casualty & Surety Co. v. Superior Court* (2005) 126 Cal.App.4th 1131, 1139 [24 Cal.Rptr.3d 751] [concept of self-determination is critical to mediation process]; *Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 270 [11 Cal.Rptr.3d 610] [same].) It can thus be expected that most mediators would, as Lober said at the hearing on Anna's motion, consider it their duty to attempt to determine whether the parties are "acting under their own free will" in the mediation. "[P]ower imbalance[s] between spouses" are a recognized concern when family matters are mediated. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2004) ¶ 3:516, p. 3-81 (rev. #1, 1996), italics omitted) [spouse who is overbearing or dominates conversation may have advantage].) Therefore, "[d]ivorce mediators generally work to balance the negotiating power between the parties. This tends to produce agreements that are more fair and voluntary, rather than coerced." (Roth et al., The Alternative Dispute Resolution Practice Guide (2005) § 31:5, p. 31-5.) Thus, while mediation is no guarantee against the exercise of undue influence, it should help to minimize unfairness in the process by which a marital settlement agreement is reached.

Even more importantly, to apply the presumption of undue influence to mediated marital settlements would severely undermine the practice of mediating such agreements. Application of the presumption would turn the shield of mediation confidentiality into a sword by which any unequal agreement could be invalidated. We do not believe that the Legislature could have intended that result when it provided for spousal fiduciary duties on the one hand and for mediation confidentiality on the other.

It is apparent from our review of the statutes and cases that the mediation privilege is broadly framed and strictly construed. Mediation communications are generally shielded from disclosure unless all participants expressly agree otherwise. (§§ 1119, 1121, 1122.) This " 'supermajority' requirement . . . effectively creates a 'super privilege'—impenetrable by public policies

favoring disclosure . . . ." (Scallen, *Relational and Informational Privileges and the Case of the Mysterious Mediation Privilege* (2004) 38 Loyola L.A. L.Rev. 537, 588.) There is no good cause exception to the privilege (*Rojas v. Superior Court, supra,* 33 Cal.4th at pp. 423–424), and no exception to the privilege can be implied (*Eisendrath, supra,* 109 Cal.App.4th at pp. 362–363). Thus, in the case of a mediated marital settlement agreement to which the presumption of undue influence attached, the disadvantaged party could claim, for example, to have acted under duress, refuse to waive the privilege, and thereby prevent the other party from introducing the evidence required to carry the burden of proving that no duress occurred. (See Comment, *The Mediation Privilege and Its Limits* (2000) 5 Harv. Negot. L.Rev. 383, 395 [observing that "an iron-clad confidentiality rule could encourage unfounded claims of duress"].) All unequal mediated agreements would, in effect, be conclusively presumed to be invalid.

This result would, in our view, substantially diminish the incentive to mediate marital property settlements. While there are a number of reasons why parties may opt for mediation (see Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra,* ¶ 3:13 et seq., p. 3-5 et seq. (rev. #1, 2004) [listing numerous advantages of mediation over litigation, including speed, flexibility, and cost savings]), such parties, like anyone entering into negotiations (Cal. Judges Benchbook: Judges Guide to ADR (CJER 2004) § 4.5, p. 28 [mediation has been characterized as "assisted negotiation"]), can be expected to pursue their best interests and strive for an advantageous bargain. If, by virtue of the mediation privilege and the presumption of undue influence, any such favorable bargain could, as we have posited, be set aside at the option of the disappointed party, the effectiveness of mediation as a method of settling marital property disputes would be greatly impaired. Many mediated settlements might be jeopardized because relatively few of them, upon close scrutiny, would likely be found to have been perfectly equal.

To countenance that result would contravene the strong legislative and judicial policies favoring mediation and settlement. (Code Civ. Proc., § 1775, subd. (c) [mediation may help reduce courts' caseload; public interest dictates that mediation "be encouraged and used where appropriate by the courts"]; Bus. & Prof. Code, § 465, subd. (b) [greater use of mediation should be encouraged]; *Rojas v. Superior Court, supra,* 33 Cal.4th at p. 415 [policy favoring mediation]; *Stewart v. Preston Pipeline Inc., supra,* 134 Cal.App.4th at p. 1583 [policies favoring mediation and settlement]; *In re Marriage of Friedman* (2002) 100 Cal.App.4th 65, 72 [122 Cal.Rptr.2d 412] [it is "well settled that property settlement agreements occupy a favored position in California"].) The damage to those policies would be especially severe if marital property mediations were impaired, because mediation is recognized as a particularly appropriate means of dispute resolution in that context. (See Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra,*

¶ 3:511, p. 3-79 (rev. #1, 2004) [mediation is especially appropriate for domestic relations matters], ¶ 3:40, p. 3-10 (rev. #1, 2001) [mediation has become widely used in marital and family disputes].)

█ The presumption of undue influence must therefore yield when a marital settlement agreement is achieved through mediation. We recognize that this conclusion places parties defending mediated marital settlements at an advantage. Those parties can refuse to waive the privilege and thereby prevent their settlements from effectively being challenged. That result can be criticized. (See Deason, *Enforcing Mediated Settlement Agreements: Contract Law Collides With Confidentiality* (2001) 35 U.C. Davis L.Rev. 33, 102 [opining that, "[g]iven the importance of both confidentiality and full consent to mediated settlements, an inflexible rule in favor of ensuring one but not the other of these values is inappropriate"].) However, if there is a price to be paid in fairness to preserve mediation confidentiality, the cases have required that it be paid by parties challenging, not defending, what transpired in the mediation. (See *Eisendrath, supra,* 109 Cal.App.4th at p. 365 [discussing *Foxgate, supra,* 26 Cal.4th at p. 17, and acknowledging "substantial measure of control" party defending mediated support agreement would have over other party's ability to present evidence in support of motion to correct agreement].) In choosing between a rule that may allow some unfair agreements to stand and a rule that jeopardizes all unequal agreements, "[w]e must not lose sight of the fact that 'California has a strong policy encouraging settlements' [citation] . . . ." (*Stewart v. Preston Pipeline Inc., supra,* 134 Cal.App.4th at p. 1583.) Given that strong policy, the rule that promotes certainty and finality must govern.

█ Second, the presumption of undue influence should not apply in a case like this where the influence is alleged with respect to a judgment that has long been final. The presumption is asserted here in a motion under Family Code section 2122, part of the "Relief from Judgment" chapter of the Family Code. (*In re Marriage of Heggie* (2002) 99 Cal.App.4th 28, 32 [120 Cal.Rptr.2d 707] [referring to Fam. Code, §§ 2120–2129].) Within six months after a marital dissolution judgment is taken, relief from the judgment can be sought under Family Code section 2122 or Code of Civil Procedure section 473. (*In re Marriage of Heggie, supra,* 99 Cal.App.4th at p. 32.) Family Code section 2122 specifies "the exclusive grounds and time limits for an action or motion to set aside a marital dissolution judgment" (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 684 [76 Cal.Rptr.2d 691]), after the six-month deadline under Code of Civil Procedure section 473 has passed (Fam. Code, § 2121, subd. (a)).

As we noted at the outset, under former Family Code section 2122 the potential grounds for setting aside the judgment in this case were fraud, perjury, duress, mental incapacity, and mistake. We will assume for purposes of this opinion that the concept of "undue influence" in spousal transactions is broad enough to subsume all of the grounds for relief Anna advanced under Family Code section 2122. Anna alleged that Maciej exerted great pressure on her to reach a settlement, and prevented her from obtaining counsel or otherwise protecting her interests, conduct characterized as both "duress" and "undue influence" in *In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 84–85 [260 Cal.Rptr. 403]. Anna alleged that Maciej misrepresented his rights to future royalty payments and concealed payments he was receiving. Such breaches of the duty of disclosure Maciej owed Anna by virtue of their fiduciary relationship would constitute undue influence (see *In re Marriage of Bonds, supra*, 24 Cal.4th at p. 27), and provide grounds for setting aside the judgment under Family Code section 2122 for fraud, perjury, and mistake (see *In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1345 [113 Cal.Rptr.2d 849]). Whether the presumption of undue influence would apply to Anna's claims to have been mistaken about her community property rights presents a closer question, but the presumption could at least arguably extend to those claims as well. (See *In re Marriage of Mathews, supra*, 133 Cal.App.4th at p. 630 [presumption is dispelled if, among other things, disadvantaged spouse had full knowledge of facts and completely understood effect of transaction]; *In re Marriage of Friedman, supra*, 100 Cal.App.4th at p. 72 [evidence showed that wife understood scope and purpose of postnuptial agreement; husband carried burden of showing that wife did not enter into postnuptial agreement through mistake].)

Nevertheless, there is no precedent for applying the presumption in the context of a Family Code section 2122 motion, and those seeking to set aside judgments have always borne the burden of proof. Prior to the enactment of Family Code section 2122 and its predecessor statute, marital dissolution judgments could be set aside in equity, after expiration of the Code of Civil Procedure section 473 deadline, on the grounds of extrinsic fraud or mistake. (See *In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 136, 139–140 [63 Cal.Rptr.2d 894].) Where relief from a judgment is sought on Code of Civil Procedure section 473 or equitable grounds, the moving party bears the burden of proof. (See, e.g., *Schwab v. Southern California Gas Co.* (2004) 114 Cal.App.4th 1308, 1319 [8 Cal.Rptr.3d 627] [moving party bears burden under Code Civ. Proc., § 473]; *Aheroni v. Maxwell* (1988) 205 Cal.App.3d 284, 291 [252 Cal.Rptr. 369] [party seeking equitable relief from judgment must make stronger showing than is required under Code Civ. Proc., § 473]; see also *Estudillo v. Security Loan etc. Co.* (1906) 149 Cal. 556, 564 [87 P. 19] [burden of proof "rests upon no one more heavily" than one alleging that judgment was procured by fraud].) We take it that the burden of proof would rest where it has

always rested, with the moving party, when a Family Code section 2122 challenge is made against a judgment entered after trial. In that event, there would be no "transaction" that could give rise to a burden-shifting presumption of undue influence. (See *In re Marriage of Mathews, supra,* 133 Cal.App.4th at p. 629 [presumption applies if "(1) there exists an interspousal transaction; and (2) one spouse has obtained an advantage over the other"].) The question of burden shifting arises only if the judgment is reached via a settlement.

We have found no case other than our decision in *In re Marriage of Rosevear, supra,* 65 Cal.App.4th 673, that has addressed the burden of proof under Family Code section 2122. There, a motion to set aside a stipulated judgment was made on the grounds of mistake and duress. In addressing the mistake allegation, we wrote: "Under [Family Code] section 2123, a trial court may not set aside a dissolution judgment on the *sole* grounds the judgment is inequitable or the support ordered is inadequate. As discussed, a party seeking to set aside a dissolution judgment must first establish the existence of at least one of the five exclusive grounds for relief enumerated in [Family Code] section 2122 (fraud, perjury, duress, mental incapacity, or mistake), and additionally that the presence of this element 'materially affected the original outcome' in such a way 'that the moving party would materially benefit from the granting of the relief,' as required by section 2121, subdivision (b). In other words, the moving party must establish *both* the presence of at least one of the five factors listed in section 2122, and that this resulted in material disadvantage to the moving party." (*In re Marriage of Rosevear*, at p. 685, fn. 11.) The thrust of this discussion is that the moving party would bear the burden of proving grounds for relief under Family Code section 2122, even if that party were disadvantaged by a marital settlement, i.e., in a situation where a presumption of undue influence would arise. *Rosevear*, however, is inconclusive on the issue because the agreement there was an equitable one between the parties, and the case did not address the undue influence presumption. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] [opinions are not authority for propositions they do not consider].)

It is thus evidently a question of first impression whether Maciej was properly required to bear the burden of proof on Anna's Family Code section 2122 motion. Since marital settlement agreements are routinely incorporated into judgments, it can be argued that incorporating such an agreement into a judgment should not automatically dispel the presumption of undue influence. On the other hand, after some passage of time, the presumption bumps up against the policy favoring finality of judgments. As the court stated in *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1071 [202 Cal.Rptr. 116], "[m]arital settlement agreements, once incorporated into a judgment, are no longer mere contracts. . . . [T]hey become a hybrid, more like a judgment than

a contract . . . ." "Once relief is no longer available under section 473, the public policy in favor of finality of judgments predominates, and the power to set aside valid final judgments and marital settlement agreements incorporated therein should be exercised only when exceptional circumstances require that the consequences of res judicata be denied. Thus, during the period when relief under section 473 is available, there is a strong public policy in favor of granting relief and allowing the requesting party his or her day in court. Beyond this period there is a strong public policy in favor of the finality of judgments and only in exceptional circumstances should relief be granted." (*Ibid.*)

■ While *Stevenot* was decided before Family Code section 2122 was enacted, at a time when spouses were not considered to owe each other fiduciary duties and were deemed to deal at arms' length after separating or petitioning for dissolution (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1071), the policy favoring the finality of judgments has not changed. That policy militates strongly in favor of keeping the burden of proof under Family Code section 2122 with the moving party, at least where, as here, relief is sought after the time to act under Code of Civil Procedure section 473 has expired. (*In re Marriage of Stevenot,* at p 1071.) Family Code section 2120 et seq., reflect a balancing of the "public policy of assuring finality of judgments" and "the public interest in ensuring proper division of marital property." (Fam. Code, § 2120, subd. (c).) Nothing in these statutes suggests any intent to alter the burden of proof that has long been placed on parties challenging marital dissolution judgments. Accordingly, we conclude that a party seeking relief from a judgment that incorporates an unequal marital settlement agreement must bear the burden of proof under Family Code section 2122, at least where the judgment, as in this case, is at least six months old.

■ Third, the presumption of undue influence should not attach in this case because the parties acknowledged in the MSA that no undue influence was exercised. In the MSA, the parties stated that they were cognizant of the fiduciary duties they owed each other in their financial affairs, had exchanged the requisite disclosures, and were "fully aware of the contents, legal effect and consequences of this agreement and its provisions." They affirmed that they had entered into the MSA "voluntarily, free from duress, fraud, undue influence, coercion or misrepresentation of any kind." While such avowals might themselves be the product of undue influence, we think that they should count for something, at least where, as here, the parties' capacity is not in question.

■ " 'A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in

the action.' (§ 600, subd. (a).) The trier of fact is required to assume the existence of the presumed fact 'unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption.' (§ 604.)" (*In re Marriage of Haines, supra,* 33 Cal.App.4th at pp. 296–297.) ██ The MSA was by its terms intended to be a complete and binding settlement of all custody, support, and property issues, and there is no dispute that the agreement itself was admissible. (§ 1123, subd. (b) [written settlement achieved in mediation is admissible if it "provides that it is enforceable or binding or words to that effect"].) The MSA strongly "support[ed] a finding of [the] nonexistence" of the presumed undue influence and thereby negated that presumption. (§ 604.) That did not mean Anna could not show that undue influence was exerted, only that she had the burden of proof in so doing.

### (3) *Evidence From the Mediation*

We now turn to Anna's argument that evidence from the mediation was wrongly admitted on her motion to set aside the MSA and judgment. We conclude that any such error was harmless under the circumstances here.

The first point to be made is that, in view of our conclusion that Anna must bear the burden of proof on her challenges to the judgment, she would be compelled to fully waive the mediation privilege if the matter were retried. Without that waiver, the evidence would essentially consist of her testimony that Maciej coerced her into agreeing to a mediation, and the MSA's provisions confirming that the agreement was reached freely, fairly, and with full financial disclosures. As a matter of law, Anna could not prevail with the case in that posture. Even if she was forced into the mediation as she claimed, she would have no meritorious ground for setting aside the judgment if the mediation itself was entirely fair. According to the MSA Anna signed, the mediation was untainted by "duress, fraud, undue influence, coercion or misrepresentation of any kind." To prove otherwise, she would need to show what transpired in the mediation.

The problem then arises for Anna that the evidence from the mediation— apart from her testimony, which the court largely discounted—favored Maciej on every timely issue she raised. On the key question underlying Anna's allegations of fraud, perjury, and failure to disclose—her awareness of Maciej's prospect of continuing royalties—the evidence, in the words of the statement of decision, "overwhelmingly" belied her claim of ignorance. That evidence included: Lober's e-mail reporting Maciej's statement at a mediation session that he expected a "substantial amount" of future royalties; the exhibits to Tollemache's appraisal report for the royalties showing hypothetical royalty payments in future years, rather than royalties of zero value; the

report's summary of royalty payments received, which indicated that Maciej received royalties for the fourth quarter of 1998, a period for which Anna allegedly thought no royalties were owed; Tollemache's testimony that he sent Anna the appraisal report and discussed it with her; Tollemache's testimony that Maciej "absolutely" did not tell him there would be no further royalty payments; and Maciej's testimony that Anna must have received the royalty appraisal report because it was used in a mediation session.

 Anna's fraud, perjury, and failure to disclose claims were untenable in the face of this evidence. As for fraud and perjury, Anna would have known from the appraisal report that future royalty payments were possible, and that Maciej's 1999 income and expense declaration was incorrect in failing to list any royalty payments received during the preceding 12 months. With respect to disclosure, Anna maintains that there were various omissions in the financial information Maciej provided, and she asserts that he never properly served any declaration of disclosure. However, apart from her claimed ignorance of the continuing royalties, she identifies no prejudice suffered as a result of these alleged failures. Anna notes that under Family Code section 2107, subdivision (d), failure to comply with the financial disclosure requirements in a marital dissolution "does not constitute harmless error." However, this statute does not apply to the judgment in this case (Stats. 2001, ch. 703, § 8 [statute applicable to judgments that became final after Jan. 1, 2002]), and a showing of prejudice is still required despite this statutory language (*In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519, 526–528 [11 Cal.Rptr.3d 671]).

As to whether Anna acted under duress because Maciej prevented her from retaining counsel, mediation evidence was not the primary focus. The most important evidence on this issue was Anna's January e-mail to Hanson telling him to do nothing without her authorization but to keep her retainer in case she needed his services, and Anna's failure to ask that the retainer be refunded until after the terms of the MSA were settled. In light of this evidence, the court rejected Anna's testimony that she thought she had fired Hanson when she told him not to act without her authorization, and that she did not think she could consult with him during the mediation. The court found that "Anna consciously and carefully assured for herself access to continuing legal advice," but "subsequently chose not to avail herself of [Hanson's services]." Evidence from the mediation further supported this finding insofar as Lober and Maciej testified that Lober advised the parties that they were free to consult with counsel in the mediation.

Similarly, the court's assessment of Anna from watching her testify, as much as anything that occurred in the mediation, led it to reject Anna's claim

that her will was generally overborne in connection with the MSA. Because Anna appeared to be a "highly intelligent" woman with "a very strong will," the court had "much difficulty in accepting Anna's depiction of herself as weak and easily susceptible to undue influence or duress exercised by Maciej." As for evidence concerning the mediation and the execution of the MSA, the court was more impressed by the fact that the mediation process extended over a period of months than by anything communicated during the sessions. The court found that "[t]he passage of time and deliberateness of the mediation process . . . belie[d] any finding of duress." There was conflicting evidence as to what transpired in the mediation sessions, with Anna testifying that she often broke down and cried, and Lober recalling no coercion or duress. Likewise, Anna said that she wept in humiliation at the meeting with Tollemache because Maciej said that she would get more property from him over his dead body, but Tollemache did not remember Maciej making any such statement. In the statement of decision, the court indicated that it believed Lober and Tollemache on these points.

Accordingly, Anna has no prospect of meeting her burden of proof even if she agrees, as she must, to admission of the mediation evidence.[4] If the matter were retried, the mediator could once again object to providing evidence. (See Kirtley, *The Mediation Privilege's Transition From Theory to Implementation: Designing a Mediation Privilege Standard to Protect Mediation Participants, the Process and the Public Interest* (1995) 1995 J. Disp. Res. 1, 31 ["mediators regularly refuse to be the 'tie-breaking' witness in a subsequent proceeding, even when the parties so desire"].) However, Anna would not prevail regardless of how any such objection were resolved.

In ordering the mediator to testify and produce documents, the trial court relied on *Olam, supra,* 68 F.Supp.2d 1110. Thus, the propriety of the evidentiary ruling hinges on whether *Olam* remains a viable precedent, which is an open question in the wake of the Supreme Court decisions in *Foxgate* and *Rojas*. *Olam* creates a nonstatutory exception to mediation confidentiality when a balancing of the need to do justice in a case against the potential for discouraging mediation weighs in favor of compelling a mediator to testify. (*Olam, supra,* 68 F.Supp.2d at pp. 1131–1132, 1139.) *Olam* is questionable given *Foxgate*'s and *Rojas*'s refusals to recognize nonstatutory or good cause exceptions to the mediation privilege. (*Rojas v. Superior Court, supra,* 33 Cal.4th at p. 424; *Foxgate, supra,* 26 Cal.4th at p. 15.) The *Eisendrath* court thought that *Olam* should be "closely limited to [its] facts" in view of *Foxgate* (*Eisendrath, supra,* 109 Cal.App.4th at p. 361) and, as the *Doe 1* court

---

[4] This conclusion and the foregoing discussion dispose of Anna's argument that the court's findings were not supported by substantial evidence even if the mediation evidence was properly admitted.

remarked about another mediation privilege issue, "[d]rawing fine lines in this area," like those called for in *Olam*, "seems counter to the policy embodied in *Rojas*" (*Doe 1 v. Superior Court, supra*, 132 Cal.App.4th at p. 1168, fn. 9).

We need take no position on *Olam*'s viability because the outcome would be the same in this case whether or not the decision to compel evidence from the mediator could be sustained. While we do not think that *Olam* could be stretched so far as to cover the situation the trial court faced here, where one of the parties objected to the mediator's evidence (see *Foxgate, supra*, 26 Cal.4th at p. 16 [distinguishing *Olam* on the ground that both sides in *Olam* had waived confidentiality]), *Olam* could at least arguably be extended to cover the situation that would exist here if the matter were remanded for a retrial, where both sides would be waiving the mediation privilege. Here, as in *Olam*, the mediator could be seen as the source of the most probative evidence on the merits of the parties' dispute, and compelling that evidence could be viewed as doing relatively little damage to mediation confidentiality. In *Olam*, because the mediator's testimony would concern the plaintiff's "condition and capacities," there would likely have been "relatively little disclosure of the content of her confidential communications." (*Olam, supra*, 68 F.Supp.2d at p. 1136.) Likewise here, the mediator's evidence was sought on the information Anna received in the mediation, and on the extent of her participation and comprehension, not on any position she may have taken. If Lober's evidence could thus be compelled, then Anna would lose because, as we have said, that evidence favored Maciej.

Maciej would also prevail if the mediator's evidence could not be compelled, either because *Olam* is untenable or that evidence would be inadmissible even under *Olam*'s reasoning, since that evidence was cumulative of other evidence that favored Maciej on every point. Anna's claims to have been coerced and confused in the mediation were refuted by Tollemache's testimony, and by the court's assessment of Anna's personality and capabilities from watching her testify, as well as by Lober's testimony. Anna's claim that she did not know she could consult with counsel during the mediation was undermined by her failure to discharge Hanson until after an agreement was reached, and by Maciej's testimony, as well as by Lober's testimony. Anna's claims of ignorance concerning Maciej's royalties were belied by Tollemache's testimony and report, as well as by Lober's e-mails. Consequently, Anna was not prejudiced even if Lober's evidence was wrongly admitted.

## II. SPOUSAL SUPPORT AND ATTORNEY FEES
### (No. A104661)*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. CONCLUSION

The orders on the motion to set aside the marital settlement agreement, and on the motion for modification of support and for attorney fees, are affirmed. The parties will bear their own costs on appeal.

Sepulveda, J., and Rivera, J., concurred.

A petition for a rehearing was denied April 17, 2006, and the petition of all appellants for review by the Supreme Court was denied July 19, 2006, S143082.

---

*See footnote, *ante*, page 56.