Filed 2/26/13  Shapiro v. Martenyi CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARNI SHAPIRO,<br><br>        Respondent,<br><br>v.<br><br>MATHEW MARTENYI,<br><br>        Appellant. | A133426<br><br>(San Francisco County<br>Super. Ct. No. FDI-94-013169) |

## I. INTRODUCTION

Appellant Martenyi appeals from a July 2011 order of the San Francisco Superior Court denying his motion to set aside a judgment of dissolution of his marriage to respondent Shapiro, a judgment filed in December 1994.  We find that substantial evidence supports the trial court's entry of this order, and reject appellant's contention that the documents indicating his agreement to that dissolution contained forgeries of his signature.  We also reject other contentions raised by appellant, e.g., that the trial judge who heard and denied his motion was biased against him because of his having been sentenced to prison for a federal crime.  We affirm the order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The parties were married in 1983 and separated in 1993; they had one child between them, a daughter born in 1985.  In 1981, they purchased a residence in San Francisco, where respondent still lives.  During that period of time, appellant was an attorney practicing in the Bay Area and respondent a school teacher employed by a private school in Marin County.

1

In October 1993, appellant was arrested in San Francisco and transported to Florida because of his alleged involvement in a drug conspiracy there. He was scheduled to be tried there in January 1994, but pled guilty to the charge and was sentenced to federal prison. He served his sentence in federal prisons in Tallahassee, Florida and Dublin, California and at several other locations. He was released from federal prison in May 1996.

According to appellant's filings in the trial court, after his guilty plea the parties "agreed to dissolve our marriage and began making preparations for our family's changed circumstances . . . ." On October 31, 1994, respondent filed a petition for dissolution of the marriage.

After that point in time, the parties' versions of events vary substantially. Per respondent and, as noted further below, the trial court, in October 1994 respondent's attorney (the same attorney representing her in this court) forwarded to appellant, and appellant signed, a Marital Settlement Agreement (MSA) and an Interspousal Transfer Deed (deed) transferring to respondent his interest in their San Francisco home.[1] The MSA also contained various other provisions relating to the dissolution. Attached to both documents were certificates by a notary public, Sharlene B. Franco of San Francisco, attesting to the validity of appellant's signatures. Both certificates were dated November 16, 1994. The MSA was then incorporated into a judgment of dissolution entered by the superior court on December 27, 1994.

According to the trial court's records, a copy of the Notice of Entry of Judgment was mailed by the clerk of the San Francisco Superior Court to appellant at the Pleasanton Federal Correctional Institution in Dublin on the same day. Further, per respondent's filings with the trial court, on December 30, 1994, respondent's counsel also

---

[1] Per the testimony of respondent's attorney Emley at the hearing, he sent copies of the MSA to appellant at the federal prisons in Tallahassee, Florida and Dublin, California. He testified that his understanding was that the copy dated by respondent and Emley on October 31, 1994, was forwarded to the Dublin facility and was the one ultimately signed by appellant on November 15, 1994.

2

mailed copies of the Judgment of Dissolution (with a copy of the attached MSA and the Notice of Entry of Judgment) and other documents to a Moraga, California, address. The address to which they were mailed was one that appellant had previously requested they be sent, via a handwritten letter to respondent's counsel.

Per appellant, however, matters proceeded differently. First of all, when he learned of the filings of these documents, on June 30, 2010, he wrote respondent, his former wife, and complained that the terms of the MSA were unfair to him, especially regarding the division of "the community assets" and asserted that those documents "did not and does not represent my intention." Sometime later, he took the position that he (1) wanted changes made to the MSA and (2) never signed that document or received any of the other documents respondent and her attorney allegedly sent him. According to him, his signatures on the MSA and deed were forged, and he never appeared before the notary public who provided a "California All-Purpose Acknowledgment" for both the MSA and the deed. Appellant asserted that it was not until "the end of June 2010" that he learned a "forged deed" to the property had been recorded in 1994 and the MSA, also with a similar forged signature, had been filed along with the judgment.

On April 4, 2011, appellant filed a motion to set aside the judgment together with a supporting memorandum of points and authorities and declaration. Respondent filed an opposition to the motion, to which appellant replied. The trial court (Judge Ronald Albers) set the matter for a hearing on June 23, 2011; that hearing concluded on June 27, 2011. After hearing the testimony of the parties and two other witnesses (one being respondent's counsel), Judge Albers ruled that appellant had "not sustained the burden of proof" regarding the alleged forgeries of his signatures on the MSA and deed. The court thus ruled that the 1994 judgment "will stand" and, on July 29, 2011, entered an order to that effect.

Although he did not ask for a statement of decision by the trial court, appellant filed a timely notice of appeal on September 26, 2011. But that was not all he filed; on July 27, 2011, he filed an "Affidavit of Prejudice—Peremptory Challenge to Judicial Officer" under Code of Civil Procedure section 170.6. Judge Albers denied that

3

challenge as "untimely" the following day.  An "Amended Statement of Challenge" was filed by appellant on August 1, 2011.  In it, he complained that Judge Albers had shown bias against him by noting that he had been a convict and a "felon dealing with the price of moral turpitude . . . ."  Respondent filed a response thereto and, on August 8, 2011, Judge Albers issued and filed an order striking appellant's "Statement of Disqualification."

### III. DISCUSSION

A. *The Principal Issue Presented and our Standard of Review.*

This case presents one principal issue for our review, i.e., was there substantial evidence to support the trial court's order of July 29, 2011, denying appellant's motion to set aside the 1994 Judgment of Dissolution of his marriage to respondent.  As noted above, that judgment was entered on December 27, 1994.  Appellant did not file his motion to set aside that judgment until April 2011.

Pursuant to Code of Civil Procedure section 473, a party may move to be relieved of a default judgment entered as a result of "mistake, inadvertence, surprise or excusable neglect" within a period of six months after entry of the judgment.  (Code Civ. Proc., § 473, subd. (b).)  However, regarding judgments entered under the Family Code—as this clearly was—section 2122 of that code provides longer periods during which relief may be sought, i.e.: (1) one year from the date of entry of judgment in instances where there was mistake of law or fact (Fam. Code, § 2122, subd. (e)); (2) two years where duress or mental incapacity can be shown (*id.,* subd. (c) and (d)); and (3) one year after the date the complaining party "either did discover, or should have discovered" any actual fraud, "perjury," or failure to comply with statutory disclosure requirements regarding assets and liabilities.  (*Id.*, subd. (a), (b), and (f).)  Pursuant to that section, therefore, appellant had to establish in the trial court that (1) respondent obtained the dissolution judgment through fraud, perjury or failure to comply with the Family Code's disclosure requirements, *and* (2) he discovered such no earlier than (and should not have discovered it any earlier than) one year before he filed his April 4, 2011, motion to set aside the December 1994 judgment of dissolution.

4

Indeed, in the trial court appellant specifically conceded that the first thing he had to prove was "one, that there was a fraud or perjury . . . under 2122 and A through F subsection and part and parcel of that indicates that if the court is inclined to set aside the judgment that I also must be able to show that there is an inequity in terms of the judgment." Judge Albers then stated that the latter issue was not yet before him because "it's not relevant to the preliminary issue. If I get past the issue of resolving [whether] the documents are fraudulent and not your signature then [we will] come back and look at the second or third prong." Appellant promptly responded: "That was my understanding, too, Your Honor."[2]

Obviously, whether the documents are fraudulent is a purely factual issue and, therefore, governed by the substantial evidence standard of review. "If there is substantial evidence to support a finding, an appellate court must uphold that finding even if it would have made a different finding had it presided over the trial. [Citations.] An appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact. [Citations.] 'The substantial evidence [standard of review] applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' [Citation.]" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 958; see also Eisenberg et al., Civil Appeals & Writs (The Rutter Group 2011) ¶¶ 8:38 et seq.)

The first and main issue before us, therefore, is whether there was substantial evidence before the trial court that the MSA and deed were *not* procured via fraud or perjury. If there was such substantial evidence, we must affirm the order of the trial court. The law is clear that this standard is "easily satisfied" because the "testimony of a single witness, even the party himself or herself, may be sufficient" to meet it. (9 Witkin, Cal. Procedure (5th ed., 2008) Appeal, § 369, pp. 426-427.)

---

[2] At least three other times, Judge Albers made clear to appellant that the first matter he would consider in this case was whether there was any fraud or perjury in connection with the verification of the key documents. Each time, appellant's response indicated that he understood and accepted that order of priority.

5

Appellant also raises some other issues, namely: (1) the alleged bias of Judge Albers, (2) the alleged bifurcation of the evidence at the hearing before him (so as to exclude evidence of the "gross inequity" of the MSA's division of the property), and (3) whether the MSA and judgment filed in 1994 violated Business and Professions Code section 6068 or (4) was contrary to "public policy." We will deal with those issues in a later section of this opinion.

B. *Substantial Evidence Supports the Trial Court's Ruling.*

Just a few years ago, our colleagues in Division Four of this court directed their attention to the issue of who bears the burden of proof in an action brought under Family Code section 2122. In *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, that court held that, after the enactment of that statute "the policy favoring the finality of judgments has not changed. That policy militates strongly in favor of keeping the burden of proof under Family Code section 2122 with the moving party, at least where, as here, relief is sought after the time to act under Code of Civil Procedure section 473 has expired. [Citation.] . . . Accordingly, we conclude that a party seeking relief from a judgment that incorporates an unequal marital settlement agreement must bear the burden of proof under Family Code section 2122, at least where the judgment, as in this case, is at least six months old." (*Kieturakis, supra,* at p. 90.)

In this case, during the course of the hearing and in response to a question from the trial court, appellant conceded that he had to show, first of all, "that there was a fraud or perjury . . . under 2122."[3] Judge Albers clearly agreed with this because, at the conclusion of the hearing, he specifically stated that appellant had "not sustained the burden of proof" in this action. We also agree, and we find that substantial evidence supports that ruling by the trial court.

First of all, there was substantial evidence before that court regarding the execution by appellant of both the MSA and the deed, and that appellant's assertions that

---

[3] However, nowhere in either of appellant's briefs to this court is Family Code section 2122 cited much less discussed.

6

they contained signatures that were forged were both very belated and also unsupported by the evidence.

As already noted, the judgment filed December 27, 1994, had a copy of the MSA attached to it. The MSA was purportedly signed by respondent wife on October 31, 1994, and by appellant on November 15, 1994. And, on the third page of the MSA is a hand-written note in, apparently, appellant's handwriting and under the typed heading "CUSTODY OF MINOR CHILDREN" which reads: "Husband and Wife shall have joint legal custody."[4] Next to it is an initial or initials which are very similar to those on the other key documents, including one which appellant admitted signing. Additionally, the purported signature of appellant on the MSA is very similar to that on the document appellant admitted signing and filing. Similarly, the deed also bears a similar signature by appellant, albeit dated November 16, 1994.

Both the MSA and the deed were notarized by a then-licensed notary public, Sharlene B. Franco, on November 16, 1994. Both certificates executed by Franco provide her commission number and the fact that she was then licensed as a notary in the City and County of San Francisco until "Sept. 27, 1996."[5] Both certificates also complied with the form specified by Civil Code section 1189.[6] Under both Civil Code section 1190 and Evidence Code section 1451, these certificates constitute "prima facie evidence of the facts recited in the certificate and the genuineness of the signature of each

_____

[4] Nowhere in his briefs to us or in his declaration in the trial court do we find any contention by appellant that this handwritten sentence in the MSA filed with the court was not written by him.

[5] Thus refuting appellant's rather extreme assertion that the documents were notarized by a "phantom notary public."

[6] Appellant asserts that the "notary acknowledgment of the MSA filed with the court does not specify the document allegedly being notarized, is different than the acknowledgment prepared by attorney EMLEY and is at variance with dates next to the signatures." But nothing in Civil Code section 1189 or any other provision we have found requires either a specification of the document being notarized or that the date on the acknowledgements of the notary be the same date as that of the signature being acknowledged. (See Civ. Code, § 1189; see also *Clements v. Snider* (9th Cir. 1969) 409 F.2d 549, 551.)

7

person by whom the writing purports to have been signed . . . ." (Evid. Code, § 1451.) Under Evidence Code sections 602 and 604, such means that there is a rebuttable presumption as to the veracity of the facts asserted in the certificate, a presumption which can only be overcome by "evidence . . . which would support a finding of its nonexistence." (Evid. Code, § 604.)

Appellant introduced no such evidence. Indeed, at the hearing, he conceded that, while he was imprisoned at the federal prison in Dublin, he was "called out [of] my work assignment" to meet with a notary (no name mentioned) who "came with a stack of documents, and I was trying to review them, and she wanted to get going. And I did the best I could with the circumstances I was confronted with." That person was, he testified, a "notary public" who wanted all the documents signed.

However, per his declaration and some attachments thereto, the notary objected to appellant's "interlineations and additions to [the] sections of the marital settlement agreement . . . stopped me and said that I could not make changes to the documents already blue pen signed by SHAPIRO and attorney Emley. I said, if that were the case, then I would not sign the Marital Settlement Agreement or the Appearance Stipulation and Waivers, but would instead retain the documents for a visit from SHAPIRO." The declaration went on to state that he then talked to his wife and "[s]he agreed to have the documents provide for joint legal custody and for us to liquidate the PROPERTY after the divorce." Attached to this declaration was a copy of the MSA bearing the signature of respondent and dated November 14, 1994, but no signature of appellant. That copy also includes appellant's apparent handwritten addition (albeit with slightly different wording) to section V, the provision relating to the custody of minor children.[7]

In his brief to us, appellant states that there was "overwhelming evidence before the [trial] court that the Notary Acknowledgment of MARTENYI'S purported signature

_____

[7] In his reply brief to us, appellant complains that the MSA prepared by respondent's counsel never mentioned that appellant was incarcerated. We fail to see the significance of this, particularly as it relates to the primary issue before the trial court, i.e., was or was not appellant's signature on the MSA forged.

8

was flawed obliterated any presumption it was MARTENYI'S signature. The notary's commission expired September 27, 1996, with no record of the Notary Public Journal being turned in as required by Government Code § 8209(a), or the inability to locate the notary after diligent search by MARTENYI."

We disagree. There was no evidence we can locate in the record (nor does appellant cite us to any) that the notary's acknowledgement was "flawed" other than the fact that the San Francisco County Clerk proffered a "Certificate of No Record", stating that it had no record of a Notary Public Journal having been turned in by notary Franco to the County Clerk's office, as required by Government Code section 8209, subdivision (a).[8] Such being the case, we conclude that the presumption mandated by Evidence Code sections 602 and 604 still applies to the two acknowledgements executed by notary Franco.

Moreover, in her opposition to appellant's motion to set aside the judgment and the MSA, respondent notes that the notary public who verified the MSA and the deed "mailed the MSA and [the deed] to my attorney via FedEx because the prison had returned to my attorney his stamped and self-addressed envelope since the stamps were unauthorized items which could not be given to an inmate." Respondent's counsel filed a declaration to the same effect, and attached to it is a copy of a Federal Express form (a "Recipient's Copy") reciting that, on November 16, 1994, that company had delivered an envelope from Sharlene Franco in Danville, California, to respondent's attorney in San Francisco. Further, the handwriting of Franco's name on that Federal Express form appears very similar to her signature on the two verifications appellant now asserts to be forgeries. These documents, including specifically the declaration filed by respondent's

---

[8] However, and unaddressed by appellant, is Government Code section 8209, subdivision (c), which allows a county clerk to destroy such records "upon order of court" if no request has been made for such for 10 years after their deposit. Also unexplained by appellant is what constituted his "diligent search" for former notary Franco, a search which he asserts was fruitless. The lack of any such evidence is troubling because this court's use of simple internet search engines discloses the apparent presence in several western states of people named "Sharlene B. Franco."

9

counsel Emley, clearly rebut appellant's arguments that there was no proof that a licensed notary had visited him while he was in the federal prison in Danville and secured and verified his signature on the MSA.

Next, appellant's own assertions as to when he discovered what are significantly contradicted by records provided to the trial court. For example, in his declaration in support of his motion to set aside the judgment and MSA, appellant relates that he went to Budapest, Hungary, in June of 2010 to meet his daughter and participate in some family-related matters. As a "[p]art of this process," he brought to Hungary many personal documents including his "divorce papers." Then the declaration continued:

"33. When I reviewed the court file for the first time in Budapest, I saw that SHAPIRO submitted fraudulent documents in the processing of our divorce. Upon my return from Budapest at the end of June 2010, I also discovered that she had recorded a forged deed to the PROPERTY on November 18, 1994.

"34. The forged documents in the court file in this action include the Marital Settlement Agreement that has a forgery of my signature dated 11-15-94 and the Appearance, Stipulation and Waivers form that also has a forgery of my signature dated 11-15-94." In the trial court, appellant also specifically testified that his "first discovery of the forgeries" was when he was in Hungary in June 2010.[9]

However, the record before us rather clearly undermines appellant's assertion that he "discovered" the alleged forgeries "at the end of June 2010." Specifically, on June 30, 2010, appellant addressed a two-page, typed letter to respondent Shapiro. In it, appellant related to his former wife that he and their daughter had just visited Hungary and that, in the process, "[a]mong the documents I had to gather to process the passports included our divorce papers which I pulled from the court file in San Francisco. When I reviewed the papers I was shocked and amazed and, frankly, could not believe that I—or anyone else for that matter—could ever knowingly enter into such a patently one-sided and unfair

---

[9] In one of those references, appellant apparently used the date "2011," but he clearly meant 2010, because that was consistent with his other testimony and, besides, the case was being tried in June 2011.

agreement. It provides to you all of the community assets we had accumulated. It provides me nothing. [¶] I cannot believe that this was either your or my intent. The circumstances under which the divorce occurred were difficult, confusing and fraught with physical, mental and emotional trauma. Perhaps that is why the court file documenting our divorce is filled with flagrant errors, omissions and wholly bereft of any integrity. [¶] . . . I do not want the court file to remain as it is and intend on setting the record straight that the documents contained therein did not and does not represent my intention."

Nowhere in this June 30, 2010, letter did appellant make any mention that there had been any forgeries in either the MSA or the deed. Nor does the record contain any other evidence that, "at the end of June 2010," appellant discovered any alleged forgeries of the key documents, as alleged in his declaration to the trial court. At trial, respondent's counsel asked appellant, indeed several times, whether his June 30 letter to former wife alleged that "someone other than you" had signed the MSA. Appellant avoided answering that question several times, ending up saying that "the letter speaks for itself."

Other documents in the record also confirm that, even earlier, i.e., at the time he was imprisoned, appellant was supplied with the key documents relating to the dissolution of the parties' marriage and the division of property. Thus, on December 21, 1994, while appellant was still in federal prison, he sent a hand-written letter to his wife's counsel enclosing "my executed Declaration Regarding Service of Final Declaration of Disclosure and Income and Expense Declaration. As indicated therein, I have forwarded the Income and Expense forms to Marni [i.e., respondent] on this date. [¶] I assume that this matter is now concluded and I would appreciate your providing endorsed filed copies of all the documents you have filed with the court at the address indicated below."[10] As indicated, a Moraga, California, post office box address (a post office box appellant

_____

[10] In his testimony before the trial court, appellant conceded that he assumed the documents respondent's counsel Emley "had filed with the court" would "of course" include a judgment.

11

testified was known to and available to his father), was then written beneath appellant's signature (a signature which, incidentally, is very similar to those appellant now claims were forged.)[11]

Nine days later, i.e., on December 30, 1994, respondent's counsel's office forwarded to appellant at the designated Moraga post office box copies of all the key documents, including specifically the judgment and notice of entry of judgment. At the trial, attorney Emley testified that he "approved" the letter and had "instructed" the paralegal in his office who signed it "to use the special address that Mr. Martenyi requested us . . . to use" to send him a copy of the December 27, 1994, judgment and the attached MSA.

At trial, appellant was specifically asked if he received these documents; his answers were several and varied. First, he said he told respondent's counsel he had "no idea whether you sent anything or not," then he said he "I assumed you sent them," and lastly he said "I had no way of knowing whether you sent them or not, Mr. Emley, I was in prison." But he conceded he never asked respondent's counsel for another copy of the "court documents." He also conceded that he waited another 10 months after his alleged June 2010 "discovery" of the two forged signatures to file his suit to vacate the judgment, and explained that he was ill during that period but was "working on" the pleadings commencing the action.

Finally, one other admission by appellant supports the trial court's holding. In May 1994, appellant signed a deed transferring to respondent, his then-wife, his interest in their San Francisco house. This deed was never recorded in the County Recorder's office, but was entirely consistent with the November 1994 deed, which was. Appellant conceded that he signed the May 1994 deed and "may have" delivered it to either respondent or her attorney, and that he never attempted to rescind it. He explained that

---

[11] This Moraga post office box address was also used by appellant in his in pro per "Declaration Regarding Service of Final Declaration of Disclosure and Income and Expense Declaration," a document signed by him on December 21, 1994, and filed on December 27, 1994.

he executed this earlier deed because "it was at or about the time that we were divorcing and I had not known what my sentence would be," although per a federal agency report "I would be subject to a minimum of 10 years to life in prison" and thus wanted to "have my interest in the property be transferred to her."

All of these factors, especially when considered together, amount to substantial evidence supporting the trial court's ruling that appellant had not sustained his burden of proof that the MSA and deed contained forged signatures.

C. *Other Issues Raised by Appellant.*

As noted above, the alleged forgery of his signatures on the two documents is the principal argument raised by appellant in his briefs to us, but not the only one. We will now review, albeit more briefly, the other various contentions asserted by him in those briefs.

First of all, appellant contends that he was prejudiced by Judge Albers reference to, and apparent consideration of, his federal drug conviction. He specifically references that court's statement at the conclusion of the hearing that appellant had a "strike against [him] in terms of upholding [his] burden of proof in this matter" because he was a "felon dealing with the price of moral turpitude . . . ." Appellant objects to this, noting that he among the "seven million formerly incarcerated residents of the State of California" and that his conviction is "a status condition over which [he has] no control." Further, in his reply brief in this court, appellant accuses Judge Albers of having "bias" and "unabashed disdain for Appellant" and thus "applied his 'one strike' rule freeing him from actually adjudicating the merits of the motion." These statements (and others even more insulting and offensive[12]) are both unsupported by anything said or any ruling made by Judge Albers, and do not aid appellant in the slightest in this court.

---

[12] For example, in his reply brief appellant writes: "Judge Albers was on the bench less than two years when this matter was assigned to him and while he clearly enjoys wearing the robe and sitting on the dais, it is apparent that, unlike Justice Humphries, he shrinks from the hard work of jurisprudence." The "Justice Humphries" referred to in this insulting sentence is a judge of the Supreme Court of the Province of British Columbia who authored a June 2012 opinion in favor of appellant in a civil case

Further, it was appellant himself who disclosed, in his initial filings with the court, that he had been convicted of a felony, and the law is clear that a trial court has discretion to allow, subject to exceptions not applicable here, the use of such a conviction to attack "the credibility of a witness." (Evid. Code, § 788; see also Evid. Code § 352.) And this law applies equally to the use of such prior convictions in civil actions as well as criminal. As one of our sister courts stated in *Piscitelli v. Salesian Society* (2008) 166 Cal.App.4th 1: "Evidence that a witness has been convicted of a felony is admissible to attack the witness's credibility. (§ 788.) Such evidence is a general attack on a witness's character for honesty. [Citations.]" (*Id.* at pp. 6-7, fn. omitted.) It was not an abuse of discretion for the trial court to briefly note, in announcing its decision, the fact that, as appellant had admitted, he was a convicted felon. However, it was and is manifestly improper for appellant to twist Judge Albers' brief reference to his felony conviction into an accusation of bias.

Second, appellant contends that respondent's counsel, Christopher Emley, violated Business and Professions Code section 6068 which states that an attorney must not "seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).) He contends that Emley violated this statute by, among other things (1) preparing "false documents" and "fraudulent divorce papers", (2) failing to advise the Family Law court or his client, respondent Shapiro, in 1994 that appellant was incarcerated, and (3) authoring various false statements in the MSA regarding community property, title to the family home, etc.

We have no difficulty in similarly rejecting these broadside attacks on respondent's counsel. Because, as we have explained above, there was substantial evidence supporting the trial court's finding that the MSA and deed were properly and

---

tried in that court. Remarkably and inexplicably, appellant attaches a copy of her 11-page decision and an amendment thereto to his reply brief.

In this connection, appellant's request for judicial notice of several documents attached to his reply brief, including one relating to the British Columbia litigation, is denied.

14

validly executed by both parties, all of these clearly tangential claims of appellant also fail.

Third, appellant contends that Judge Albers improperly made a ruling "bifurcating the presentation" of his case by not allowing him, during the hearing on his motion to vacate the judgment, to present evidence or argue to the court concerning the "gross inequity in the division of community property" provided for in the MSA. We strongly disagree. Judge Albers clearly made the correct decision by directing the parties to concentrate on the issue of the genuineness of the MSA and deed, the two documents in question, and the signatures on them. Further, and as noted above, in the trial court appellant specifically indicated that he both understood and agreed with the trial court's prioritization of issues, i.e., that the first and primary issue before it was "resolving [whether] the documents are fraudulent and not your signature . . . ." If, as the court ultimately found, the MSA and deed were signed by the parties and those signatures properly verified, it clearly did not need to delve into the issue of whether the parties "equitably" distributed their property via those documents. Put another way, there was no real "bifurcation" of issues in the case; rather, there were simply rulings by the trial correct—and correct rulings we conclude—that it first had to determine if the MSA and deed were valid. If they were, there was little else to consider, given (1) the position of appellant that they constituted forged papers and (2) the law as set forth in Family Code section 2122.

Fourth and finally, appellant argues that the 1994 judgment entered by the court "violates public policy." Citing Family Code section 2120 and *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131 (*Rubenstein*), appellant contends that the principle of res judicata should not apply in a case such as this "where the default judgment is based on Respondent's misconduct as documented by Respondent's fraud and perjury on the record."

Family Code section 2120 recites the basic principle that this state has a "strong policy of ensuring the division of community and quasi-community property in the dissolution of a marriage" via the "full disclosure of community, quasi-community, and

15

separate assets" and that "occasionally" such a division "is inequitable when made due to the nondisclosure or other misconduct of one of the parties." (Fam. Code, § 2120, subds. (a) and (b).) In *Rubenstein*, the court stated: "Section 2120 et seq. authorizes a dissolution judgment to be vacated, irrespective of res judicata concerns, where the judgment was procured by fraud or perjury. In such cases, the interest in assuring the finality of judgments is outweighed by other considerations. (§ 2120, subd. (c.).)" (*Rubenstein, supra,* 81 Cal.App.4th at p. 1152.) But in this case the trial court specifically found that there *was no fraud or perjury* committed by respondent or her attorney regarding the 1994 execution and filing of the MSA, deed, and the resulting judgment. And, as we have noted above, substantial evidence clearly supports this ruling. Further, the trial court was clearly *not* relying on the principle of res judicata in its ruling. Thus, this argument also clearly fails.

## IV. DISPOSITION

The trial court's order of July 29, 2011, denying appellant's motion to set aside the judgment of dissolution of his marriage to respondent is affirmed.


_____
Haerle, Acting P.J.


We concur:


_____
Lambden, J.


_____
Richman, J.

16