Filed 9/8/21  Marriage of Woodthrop and Aufdermaur CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of KATHERINE L. WOODTHROP and STEPHEN L. AUFDERMAUR. | H047438 (Santa Cruz County Super. Ct. No. 17FL00170) |
| KATHERINE L WOODTHROP, Respondent, v. STEPHEN L AUFDERMAUR, Appellant. | |

This appeal involves the enforceability of a marital settlement agreement, which divides the parties' community property and is incorporated into the final judgment of dissolution of marriage.  Husband Stephen Aufdermaur seeks to have the judgment set aside based on wife Katherine Woodthrop's asserted failure to comply with statutory disclosure requirements.  Alternatively, husband contends the judgment must be reversed for other reasons, including that the trial court's finding that he signed the settlement agreement is not supported by substantial evidence.  We shall affirm.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

Husband and wife married in the mid-1980s and separated in 2016.  Husband was a dairy farmer until he sold his farms in the late 1990s and early 2000s.  Husband and wife invested the proceeds from the farm sales into real estate, including land in Drytown, a parcel with a home and cellular tower on it in Lockeford, and four acres in

Brookdale. Husband and wife later subdivided the Brookdale property into multiple parcels; they lived in a home on one parcel and rented out homes on five others. On the Drytown land, they created a nine-parcel subdivision, constructed a road, and ran a water line and electricity to the individual parcels.

Wife stayed home with the children until 2011, when she began working outside the home. She made $85,000 in 2019. After selling the farms, husband was not employed apart from managing the properties.

In December 2015, the parties executed three quitclaim deeds. Husband quitclaimed two of the Brookdale properties (101 and 121 Aufderwood Lane) to wife, and she quitclaimed one of the other Brookdale properties (185 Aufderwood Lane, known as the "Cabin") to husband. The deeds were signed and notarized but not recorded.

Wife filed a petition for dissolution of marriage on February 9, 2017. At that time, husband and wife had two minor children, both teenagers. Wife was represented by counsel; until September 2018, husband represented himself.

On August 8, 2017, wife's counsel emailed husband at the email address husband had provided to the court (slaufdermaur@gmail.com). Counsel wrote: "[Wife] sent me an amendment to your property settlement agreement which contains terms you've agreed to. We have our hearing on financial issues rapidly approaching on August 14. As it appears you've reached an agreement, I propose to continue the hearing for 60 days. This will allow me time to draft a formal judgment and send it to you both for review and signature. [¶] Please advise if you are in agreement. As before, I can email the judge and we can avoid showing up on August 14." The next day, wife's counsel received the following response from slaufdermaur@gmail.com: "Yes, please get the hearing continued for 60 days. Katherine and I need [a] little more time to complete the settlement agreement. Thank you Step[h]en Aufdermaur." Wife's counsel emailed the

judge requesting a continuance, copying slaufdermaur@gmail.com. The hearing was continued by email to October 16, 2017.

On October 11, 2017, wife's counsel submitted to the court a Stipulation and Order Re: Division of Community Property; Waiver of Spousal Support; Maintenance of Health Insurance (2017 settlement agreement). The 2017 settlement agreement appears to have been signed and dated by husband and wife on September 21, 2017. The agreement awards husband the properties in Drytown and two of the Brookdale properties—the Cabin and a vacant lot known as "Tortuga." The agreement provides that husband may not live in the Cabin for seven years and that, during the first three years, wife is entitled to collect all rents received from the Cabin property. The agreement awards the other Brookdale properties to wife and requires wife to maintain husband's health, dental, and vision insurance until he is eligible for Medicare and to pay husband $15,000. The agreement also includes a mutual waiver of spousal support.

On October 13, 2017, wife's counsel emailed the judge that a "stipulation resolving the financial issues was submitted for processing on October 11, 2017. The parties are jointly requesting that . . . the matter be set for further status conference in approximately 90 days. The parties intend to submit judgment paperwork in the interim." Copied on that email was slaufdermaur@gmail.com. Shortly thereafter, wife's counsel emailed husband at slaufdermaur@gmail.com: "I just emailed the judge and I expect the Monday hearing will get continued without us being there. I am attaching a copy of the stipulation [(the 2017 settlement agreement)] that was recently filed with the court. I will forward you a file-stamped copy when I receive it back from the Court Clerk."

The trial court signed the 2017 settlement agreement, which then was filed on November 20, 2017.

The case was set for trial on July 20, 2018. In advance of that date, husband, acting in propria persona, filed a trial brief. He argued that the 2017 settlement agreement should not be enforced because wife "coerced and pressured" him into signing

3

it and made changes to the agreement "without [his] knowledge." Husband further asserted that wife "has continually bragged, that her office has the machine that gives someone the ability to 'lift signatures' and place on documents. I feel this is what occurred."

The case went to trial before Judge Almquist on July 20, 2018.[1] At that time, wife presented to the court a Declaration of Property Settlement Agreement purportedly signed by her and husband in December 2015 (2015 settlement agreement). Husband denied signing the 2015 settlement agreement. After the proceeding, the court ordered the parties to file briefs "on the effect of possible copied signature(s) on the [2015 settlement agreement] and the validity of the 2017 [settlement agreement] based on lack of disclosures."

Husband retained counsel in September 2018. Husband's counsel deposed wife in early 2019. At wife's deposition, she explained that she digitally cut and pasted the signature block from one of the quitclaim deeds onto the 2015 settlement agreement. Thereafter, she conceded that the 2015 settlement agreement was not enforceable because it had not, in fact, been signed by husband.

The case proceeded to trial before Judge Samuel Stevens in March 2019 on the sole issue of the enforceability of the 2017 settlement agreement. The trial took place over the course of two days in March and April 2019.

At trial, wife testified that husband signed the 2017 settlement agreement in her presence. Husband denied signing or agreeing to the 2017 settlement agreement and stated that he would not have agreed to the division of property set forth in it. When husband was presented with a copy of the 2017 settlement agreement at trial, he testified that the signature on it was his, but suggested that the signature had been lifted from

---

[1] That proceeding was not transcribed and Judge Almquist passed away unexpectedly before a settled statement could be drafted and approved. The parties testified briefly about the July 2018 trial at the 2019 trial.

4

another document.  Specifically, he testified that he signed a different document on the date the 2017 settlement agreement purportedly was signed—a one-page document to continue the October court date.  (No such document was found in the court file.)  Upon being provided with the original 2017 settlement agreement with a wet signature, husband testified that in fact it did *not* bear his signature.  He pointed out what he said were differences between his signature and the one on the 2017 settlement agreement.

Husband denied receiving, sending, or having previously seen any of the emails exchanged with wife's counsel in August and October 2017 regarding the 2017 settlement agreement.  Husband explained that he and wife had both used the slaufdermaur@gmail.com email address.  Knowing wife knew the password to that account, he set up a new email account for himself sometime in 2017 and stopped checking the slaufdermaur@gmail.com account.  Husband admitted that he did not provide a new email address to the court or to wife's counsel.  He further admitted that he had continual access to the slaufdermaur@gmail.com account, testifying that he checked it the day before trial.

The trial judge asked husband about an apparent discrepancy between his July 2018 trial brief, in which he stated that he was coerced into signing the 2017 settlement agreement, and his testimony that he never signed it.  Husband testified that the paralegal who helped him write the trial brief said " 'This makes more sense than "I never saw it at all." ' "  Husband agreed with the court's characterization that he "took [his] factual presentation to the Court based upon what a paralegal told [him] sounded more credible."

By the time of trial, the parties had lost the Lockeford property and three of the Brookdale properties (a vacant lot and two properties with homes on them) to foreclosure.  Both husband and wife testified about the estimated value of their remaining properties.  Husband testified that the properties awarded to wife in the 2017 settlement agreement—101, 121, and 186 Aufderwood Lane and a vacant lot, all in Brookdale— collectively are worth $1.81 million and are encumbered with $612,000 of debt.

5

Wife testified that the properties awarded to her are worth less than husband estimated. Among other things, she explained that Santa Cruz County plans to build a bridge "going right through the middle of" 101 Aufderwood Lane, making that property's value uncertain, but likely less than the $550,000 asserted by husband. Wife further testified that 186 Aufderwood Lane has been red tagged by the County and, as a result, requires hundreds of thousands of dollars of work, including fixing the foundation and building a retaining wall. Wife testified that the properties awarded to her are encumbered with $920,000 in debt.

Husband valued the properties awarded to him by the 2017 settlement agreement—the Cabin (185 Aufderwood Lane), Tortuga, and the Drytown properties—at $405,000. Wife largely agreed with husband's valuation but expressed some uncertainty. The parties agreed that wife had assumed responsibility for a $110,000 note secured by one of the Drytown properties.

Following trial, the superior court found that husband had signed the 2017 settlement agreement. In its oral ruling, the court noted that both parties had "compromised their credibility with the Court," wife "for the obvious dealings with the 2015 proposed agreement" and husband "the way he testified in court." The court explained that husband's testimony that he knowingly submitted an inaccurate trial brief "because the paralegal told him it sounded better, read more convincing" made it "difficult[ to] believ[e] anything [husband said] on any contested issue in this case."

The court further concluded that "[t]here is nothing inequitable about the agreement. We have difficult properties to assess in terms of value. . . . . They're in over their heads. They made some financial decisions that were poor. They both knew what was going on."

Finally, the court noted that "[n]either party complied with the disclosure requirement[s]." The court found that "[t]hey both knew what they had . . . . They knew the good points and the bad points of all of these properties. They knew they were over

6

encumbered." Accordingly, the court concluded that "the fact that [wife] may not have provided accurate or complete disclosures . . . provided no prejudice at all . . . ." The court deemed the preliminary disclosures to be adequate, waived final disclosures for both parties, and ordered the marriage dissolved.

A judgment dissolving the marriage, which incorporated the 2017 settlement agreement, was entered on August 27, 2019. Husband timely appealed.

## II.  DISCUSSION

### A.  *Failure to Comply with Family Code Disclosure Requirements*

Husband argues that the judgment must be set aside because wife failed to comply with the statutory disclosure requirements. Specifically, he maintains her initial and final disclosures were incomplete. Wife responds that any defects in her disclosures do not require reversal because husband fails to show prejudice.

#### 1.  *Legal Principles*

"As codified in Family Code section 2100 et seq., California law recognizes the vital importance of 'full and accurate disclosure of all assets and liabilities' at the 'early stages' of a marital dissolution proceeding to ensure fair and sufficient child and spousal support awards and to achieve a proper division of community and quasi-community assets and liabilities. [Citations.] This includes a 'continuing duty' on the part of each spouse to 'immediately, fully, and accurately update and augment that disclosure' so both will have 'full and complete knowledge of the relevant underlying facts.' (Fam. Code, § 2100, subd. (c).)"[2] (*Lappe v. Superior Court* (2014) 232 Cal.App.4th 774, 780 (*Lappe*).) Accordingly, the Family Code requires parties to serve one another with preliminary and final disclosures. (§§ 2104-2105.) Section 2107, subdivision (d) provides that "if a court enters a judgment when the parties have failed to comply with all disclosure requirements of this chapter, the court shall set aside the judgment. The failure

---

[2] All further statutory citations are to the Family Code unless otherwise indicated.

7

to comply with the disclosure requirements does not constitute harmless error."  Courts have held that, despite this language, a showing of prejudice nevertheless is still required by the California Constitution.  (*In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519, 528 (*Steiner*) ["before section 2107, subdivision (d) can be the basis of reversal on appeal . . . , a noncomplying litigant must identify some portion of the judgment materially affected by the nondisclosure"]; *Lappe*, *supra*, at p. 781 [same]; *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 92 [same]; see Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

### 2. Analysis

Husband does not explain how wife's noncompliance with the disclosure requirements (or, relatedly, the trial court's waiver of final disclosures) materially affected the judgment or otherwise prejudiced him.  He argues that the terms of the 2017 settlement agreement are unfair to him, but he does not connect that claimed unfairness to the incomplete disclosures.  For example, he does not claim he was unaware of wife's salary when he agreed to waive spousal support or that her incomplete disclosures somehow caused him to agree to an unfair division of property.

For the first time on reply, husband asserts that "assets and debts remain undivided [and] property has yet to be apportioned" without identifying the assets, debts, and property to which he is referring.  Husband did not argue below that the 2017 settlement agreement failed to divide the entire community estate.  "Generally, parties cannot argue theories on appeal that they did not present in the trial court; this applies both to theories of liability and theories of defense.  [Citations.]  'Such new arguments may be deemed waived, based on common notions of fairness.'  [Citation.]"  (*In re Marriage of Brewster*

*& Clevenger* (2020) 45 Cal.App.5th 481, 510.)  Accordingly, we will not entertain husband's new argument for the first time on appeal.

Husband contends that *Steiner* is factually distinguishable because, there, the disclosure defects were not raised until the filing of a new trial motion, whereas, here, the claimed defects were raised at trial.  But the holding in *Steiner*—that setting aside a judgment for nonprejudicial error would be unconstitutional—was not fact-specific.  Instead, it was premised on a legal interpretation of section 2107, subdivision (d) and the California Constitution; that interpretation is equally applicable in the circumstances of this case.  Accordingly, we decline to set aside the judgment based on wife's incomplete disclosures, as husband has failed to demonstrate any resulting prejudice.

### B.    Undue Influence

Alternatively, husband contends that the judgment should be set aside because the 2017 settlement agreement, which the judgment incorporates, divides the parties' property and debt unfairly.  That argument appears to be based on the rule that a presumption of undue influence arises when an agreement between spouses gives one spouse an advantage.  (See *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 729; *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 27.)  When such a presumption arises, the advantaged spouse bears the burden to show that the agreement was not obtained through undue influence.  Our review of the record indicates that husband did not assert an undue influence argument below.  Therefore, we will not consider husband's new theory on appeal.

To the extent that husband is arguing—apart from any presumption of undue influence—that a marital settlement agreement must divide property equally to be enforceable, that argument fails.  "It is well settled that parties may agree in writing to an unequal division of marital property."  (*In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881, 903 (*Woolsey*); *In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 87 ["[t]he parties . . . , by written agreement or oral stipulation in open court, are free to

divide their community estate in any fashion they wish and need not divide it equally];
*Mejia v. Reed* (2003) 31 Cal.4th 657, 666 ["Whenever, as in this case, the parties agree
upon the property division, no law requires them to divide the property equally, and the
court does not scrutinize the [marital settlement agreement] to ensure that it sets out an
equal division"]; see § 2123 ["a judgment may not be set aside simply because the court
finds that it was inequitable when made"].)

### C.     Reliance on Husband's Trial Brief

Next, husband maintains the trial court erroneously treated a fact stated in his July
2018 trial brief—that he signed some version of the 2017 settlement agreement—as a
judicial admission and improperly relied on that fact in finding that husband lacked
credibility.  This argument is based on a misreading of the record.  The court's credibility
finding was not based on the 2018 trial brief, but on husband's sworn testimony at trial
that he knowingly misrepresented the facts to the court "because the paralegal told him it
sounded better, read more convincing."  We find no error.

### D.     Family Code Section 825

Husband argues that the judgment violates the law by confirming the 2015
property transfers between husband and wife, which were achieved by quitclaim deed.
He maintains the quitclaim deeds did not satisfy the transmutation requirement set forth
in section 852, subdivision (a), and the judgment cannot properly confirm those invalid
transmutations.

#### 1.     Factual Background

As noted above, in December 2015, husband quitclaimed 101 and 121
Aufderwood Lane to wife and she quitclaimed 185 Aufderwood Lane (the Cabin) to
husband.  The 2017 settlement agreement likewise awards 101 and 121 Aufderwood
Lane to wife and 185 Aufderwood Lane to husband.

10

*2. Legal Principles*

" 'A transmutation is an interspousal transaction or agreement that works a change in the character of the property [e.g., from community property to separate property and vice versa)].' [Citation.] 'In order for a transmutation of property to occur, statutory formalities must be met.' [Citation.] '[Specifically, a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.' (§ 852, subd. (a).)" (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 733-734.)

"An ' "express declaration" ' is a writing signed by the adversely affected spouse 'which expressly states that the characterization or ownership of the property is being changed.' [Citation.] 'An "express declaration" does not require use of the terms "transmutation," "community property," "separate property," or a particular locution. [Citation.]' [Citation.] 'Though no particular terminology is required [citation], the writing must reflect a transmutation on its face, and must eliminate the need to consider other evidence in divining this intent. [Citation.]' [Citation.]" (*In re Marriage of Lafkas* (2015) 237 Cal.App.4th 921, 938.)

*3. Analysis*

It is not clear that the quitclaim deeds failed to satisfy the requirements of section 852, subdivision (a), as husband asserts. Each deed is in writing, signed by husband and wife, and expressly states that one spouse "quitclaims" the specified property to the other. The term "quitclaim" means to "convey all of one's interest in (property), to whatever extent one has an interest." (Black's Law Dictionary (11th ed. 2019).) Accordingly, the parties' use of that word evinces an intent to change the ownership of the property. (See *Estate of Bibb* (2001) 87 Cal.App.4th 461, 468-469 ["since 'grant' is the historically operative word for transferring interests in real property, there is no doubt that Everett's use of the word 'grant' to convey the real property into

11

joint tenancy satisfied the express declaration requirement of section 852, subdivision (a)"].)

Even assuming the quitclaim deeds did not validly transmute the properties, that does not impact the enforceability of the 2017 settlement agreement. "Nothing in [section 852] or the legislative history suggests that spouses cannot affirm or ratify a defective transmutation agreement through a subsequent valid agreement." (*Safarian v. Govgassian* (2020) 47 Cal.App.5th 1053, 1068.) The trial court held that the 2017 settlement agreement is just such a subsequent valid agreement.

### E.     Substantial Evidence Supports the Trial Court's Factual Findings

Husband asserts that the trial court's factual findings are unsupported by substantial evidence. We disagree.

#### 1.     Standard of Review

We review the trial court's factual findings for substantial evidence. (*Carmel Development Company, Inc. v. Anderson* (2020) 48 Cal.App.5th 492, 503.) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] . . . The focus is on the quality, rather than the quantity, of the evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) In applying the substantial evidence test, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) If "there is substantial evidence in favor of the respondent . . . , no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing. [Citations.]" (*Id.* at p. 631.)

## 2. *Analysis*

Contrary to husband's claims, substantial evidence supports the trial court's finding that husband signed the 2017 settlement agreement. Specifically, that finding is supported by wife's testimony that husband signed the 2017 settlement agreement in her presence, the original 2017 settlement agreement bearing what appears to be husband's signature, and the emails to husband from wife's counsel discussing the 2017 settlement agreement and the fact that it was submitted to the court.

Husband suggests the court erred in crediting wife's testimony given her admission to forging his signature on the 2015 settlement agreement. However, "[u]nder the deferential substantial evidence standard of review, . . . '[w]e may not reweigh the evidence and are bound by the trial court's credibility determinations.' [Citation.] Testimony believed by the trial court 'may be rejected only when it is inherently improbable or incredible . . . .' " (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257 (*McPherson*).) There is nothing inherently incredible about wife's testimony that husband signed an agreement that appears to in fact bear his signature.

Moreover, " ' "[t]he ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." ' [Citation.]" (*McPherson*, *supra*, 47 Cal.App.5th at p. 257.) That surely is the case here. Again, the original 2017 settlement agreement appears to bear husband's signature, and husband was copied on numerous emails regarding the 2017 settlement agreement and the filing thereof with the court. While husband denied signing the 2017 settlement agreement, claimed the signature on it did not appear to be his handwriting, and denied reading the relevant emails, the court found he lacked credibility. That finding was amply supported by substantial evidence, including husband's admission to knowingly misrepresenting the facts to the court, his changing testimony as to whether the signature on the 2017 settlement agreement appeared to be his, and his implausible testimony that he

13

established a new email account (without informing the court or wife's counsel) and never read the pertinent emails (despite having continuous access to the old email account).

Husband also maintains that the trial court's finding that his disclosures were defective is not supported by the record. Even assuming that is true, it has no impact on the validity of the judgment. Wife's noncompliance with the disclosure requirements does not compel reversal because husband has not demonstrated any resulting prejudice; the adequacy or inadequacy of his own disclosures does not affect that analysis.

Finally, husband argues that the trial court's finding that the 2017 settlement agreement is equitable is unsupported by the evidence. We disagree. Wife's testimony demonstrated that the Brookdale properties awarded to her involve significant challenges that make them difficult to value but almost certainly worth less than the $1.81 million testified to by husband. Wife's properties are encumbered with $920,000 in debt, she assumed responsibility for a $110,000 note secured by one of the Drytown properties, and she agreed to pay husband $15,000. The properties awarded to husband by the 2017 settlement agreement are worth somewhere in the neighborhood of $405,000 and are unencumbered by debt. In light of the foregoing, we cannot say the court's finding that the 2017 settlement agreement is equitable is unsupported by substantial evidence. Moreover, even if the court had erred in finding the agreement to be equitable, husband fails to show that this claimed error requires reversal. As discussed above, marital settlement agreements are not required to divide property equally to be enforceable (see *Woolsey*, *supra*, 220 Cal.App.4th at p. 903), and "a judgment may not be set aside simply because the court finds that it was inequitable when made." (§ 2123.)

## III. DISPOSITION

The judgment is affirmed. Wife shall recover her costs on appeal.

                                   _____

                                   ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.



_____

DANNER, J.




*Woodthrop v. Aufdermaur*
H047438